NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12157

KEVIN BRIDGEMAN & others[1]  vs.  DISTRICT ATTORNEY FOR THE
SUFFOLK DISTRICT & others.[2]


Suffolk.     November 16, 2016. - January 18, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Controlled Substances.  Constitutional Law, Conduct of
     government agents.  Due Process of Law, Disclosure of
     evidence, Presumption.  Supreme Judicial Court,
     Superintendence of inferior courts.  Practice, Criminal,
     Postconviction relief, Conduct of government agents,
     Disclosure of evidence, Plea, New trial.  Evidence,
     Certificate of drug analysis, Disclosure of evidence.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on January 9, 2014.

     The case was reported by Botsford, J.


_____

     [1] Yasir Creach and Miguel Cuevas; Committee for Public
Counsel Services (CPCS), intervener.

     [2] District Attorney for the Essex District, District
Attorney for the Bristol District, District Attorney for the
Cape and Islands District, District Attorney for the Middlesex
District, District Attorney for the Norfolk District, and
District Attorney for the Plymouth District.

Matthew R. Segal (Daniel N. Marx, Adriana LaFaille, & Carlton E. Williams also present) for the petitioners.

Benjamin H. Keehn, Committee for Public Counsel Services (Nancy J. Caplan & Eric Brandt, Committee for Public Counsel Services, also present) for Committee for Public Counsel Services.

Quentin R. Weld, Assistant District Attorney, for District Attorney for the Essex District.

Susanne M. O'Neil, Assistant District Attorney, for District Attorney for the Norfolk District.

Vincent J. DeMore, Assistant District Attorney, for District Attorney for the Suffolk District.

The following were present but did not argue:

Robert J. Bender & Hallie White Speight, Assistant District Attorneys, for District Attorney for the Middlesex District.

Gail M. McKenna, Assistant District Attorney, for District Attorney for the Plymouth District.

Brian S. Glenny, Assistant District Attorney, for District Attorney for the Cape & Islands District.

Aaron M. Katz, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae.

The following submitted briefs for amici curiae:

Joseph S. Dowdy & Christine C. Mumma, of North Carolina, John Roddy, & Denise McWilliams for New England Innocence Project & another.

Janet Moore, of Ohio, & Patricia A. DeJuneas for National Association for Public Defense.

Anthony A. Scibelli & Elizabeth A. Ritvo for Boston Bar Association.

Daniel K. Gelb, Chauncy B. Wood, Naveen Ganesh, & Peter Walkingshaw for National Association of Criminal Defense Lawyers & another.

GANTS, C.J.  We once again confront the tragic legacy of the misconduct of Annie Dookhan when she was employed as a chemist at the William A. Hinton State Laboratory Institute (Hinton lab).  In Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465, 487 (2015) (Bridgeman I), the petitioners and the intervener, the Committee for Public Counsel Services (CPCS), asked that we exercise our broad powers of

superintendence to vacate the thousands of drug convictions affected by Dookhan's misconduct because the time and expense of case-by-case adjudication had become "untenable." We declined at that time to adopt their proposed "global remedy." However, the district attorneys have now provided the single justice with lists identifying more than 20,000 defendants who could be eligible for relief based on Dookhan's misconduct but who have not yet sought relief from their drug convictions. As a result of the number of potentially aggrieved defendants, the single justice issued a reservation and report to the full court that essentially invites us to reconsider whether the time has come for a global remedy or whether further steps must be taken to realistically implement the remedy of case-by-case adjudication of potentially thousands of motions for a new trial.

After such reconsideration, we decline to adopt the district attorneys' argument that we should stay the course we had previously set and take no further action to protect the rights of the "relevant Dookhan defendants."[3] We also decline to adopt the petitioners' request for a global remedy in which we would either vacate the convictions of all relevant Dookhan defendants with prejudice, and thereby bar any reprosecution, or vacate the convictions without prejudice, and allow the

---

[3] See note 8 and accompanying text, infra, for the definition of the term "relevant Dookhan defendants."

Commonwealth one year to reprosecute, dismissing with prejudice all cases not reprosecuted within that time period.

We instead adopt a new protocol for case-by-case adjudication, which will occur in three phases, and order its implementation by the single justice in the form of a declaratory judgment.  In the first phase, the district attorneys shall exercise their prosecutorial discretion and reduce the number of relevant Dookhan defendants by moving to vacate and dismiss with prejudice all drug cases the district attorneys would not or could not reprosecute if a new trial were ordered.  In the second phase, new, adequate notice shall be approved by the single justice and provided to all relevant Dookhan defendants whose cases have not been dismissed in phase one.  In the third phase, CPCS shall assign counsel to all indigent relevant Dookhan defendants who wish to explore the possibility of moving to vacate their plea or for a new trial. If the number seeking counsel is so large that counsel cannot be assigned despite CPCS's best efforts, the single justice will fashion an appropriate remedy under our general superintendence authority for the constitutional violation, which may include dismissing without prejudice the relevant drug convictions in cases where an indigent defendant is deprived of the right to counsel.

We recognize that the implementation of this protocol will substantially burden the district attorneys, CPCS, and the courts. But we also recognize that Dookhan's misconduct at the Hinton lab has substantially burdened the due process rights of many thousands of defendants whose convictions rested on her tainted drug analysis and who, even if they have served their sentences, continue to suffer the collateral consequences arising from those convictions. And we recognize as well that, more than four years after Dookhan's misconduct was revealed, more than 20,000 defendants who are entitled to a conclusive presumption that egregious government misconduct occurred in their case have yet to receive adequate notice that they may have been victimized by Dookhan's misconduct, that they may file a motion to vacate their drug conviction, and that they have a right to counsel to assist them in the preparation of such a motion. The remedy we order, challenging as it is to implement, preserves the ability of these defendants to vindicate their rights through case-by-case adjudication, respects the exercise of prosecutorial discretion, and maintains the fairness and integrity of our criminal justice system in the wake of a laboratory scandal of unprecedented magnitude.[4]

---

[4] We acknowledge the amicus briefs submitted by the National Association of Criminal Defense Lawyers and the Massachusetts Association of Criminal Defense Lawyers; the Boston Bar Association; the National Association for Public Defense; and

Background.  Dookhan began her employment in November, 2003, as a chemist at the Hinton lab, a forensic drug laboratory that was overseen by the Department of Public Health (department).  See Commonwealth v. Scott, 467 Mass. 336, 338 (2014); Commonwealth v. Charles, 466 Mass. 63, 64 (2013).  Allegations of misconduct regarding her work surfaced in June, 2011, which triggered an internal review and then a formal internal investigation by the department in December, 2011.  Charles, supra.  The department concluded that "Dookhan failed to follow [Hinton lab] protocols for the transfer and documentation of samples for testing, and subsequently created a false record of said transfers."  Id.  Dookhan was placed on paid administrative leave and then resigned from her position, effective March 9, 2012.  Id.

In July, 2012, the Legislature transferred oversight of the Hinton lab to the State police.  See St. 2012, c. 139, § 56 (replacing G. L. c. 22C, § 39); St. 2012, c. 139, § 107 (repealing G. L. c. 111, §§ 12-13).  See also Scott, 467 Mass. 338.  In August, 2012, the State police initiated a more extensive investigation of the Hinton lab, which "revealed numerous improprieties surrounding Dookhan's conduct in the lab."  Id. at 339.  See Charles, 466 Mass. at 64.  Based in part

the New England Innocence Project and the North Carolina Center on Actual Innocence.

on Dookhan's confession of misconduct on August 28, 2012, the
State police investigation revealed, among other misconduct, the
following:

- Dookhan "admitted to 'dry labbing' for two to three years prior to her transfer out of the [Hinton] lab in 2011, meaning that she would group multiple samples together from various cases that looked alike, then test only a few samples, but report the results as if she had tested each sample individually."  Scott, supra.
- She admitted to "contaminating samples intentionally, including turning negative samples into positive samples on at least a few occasions."  Id.
- She admitted that she removed samples from the evidence locker in breach of Hinton lab protocols, postdated entries in the evidence log book, and forged an evidence officer's initials.  Id.
- She falsified reports intended to verify that the gas chromatography-mass spectrometer machine used in "confirmatory"[5] drug testing was functioning properly before she ran samples through the machine.  Id. at 339-340.
- The potential scope of Dookhan's misconduct encompassed testing samples in over 40,000 cases.  Id. at 340.  This number is so large because Dookhan "reported test results

_____

[5] "Confirmatory" testing is often referred to in our opinions as "secondary" testing.  We use the terms interchangeably.

on samples at rates consistently much higher than any other chemist in the [Hinton] lab."  Id.[6]

A grand jury indicted Dookhan on seventeen counts of tampering with evidence, eight counts of obstruction of justice, one count of perjury, and one count of falsely claiming to hold a graduate degree.  Dookhan pleaded guilty to all of the indictments on November 22, 2013, and she was sentenced to from three years to five years in State prison, followed by a probationary term of two years.  Scott, 467 Mass. at 337 & n.3. The revelations regarding Dookhan's misconduct triggered the filing of hundreds of motions for a new trial and for a stay of execution of sentence in cases where the defendant was convicted

---

[6] In addition to the State police investigation, the Governor requested a top-to-bottom review of the William A. Hinton State Laboratory Institute (Hinton lab) to determine whether any other employees at the Hinton lab committed malfeasance.  The office of the Inspector General (OIG) conducted a fifteen-month investigation of the Hinton lab that included interviews with more than forty individuals and an examination of more than 200,000 documents.  The OIG concluded that "Dookhan was the sole bad actor at the [Hinton lab]" and that no other chemist at the laboratory knowingly aided her misconduct.  But the OIG report described massive deficiencies by the Department of Public Health (department) in its oversight and management of the Hinton lab.  These deficiencies included a lack of accreditation and inadequate chemist training; distant or uninterested supervisors; inconsistent testing practices; deviation from chain-of-custody guidelines; and faulty security. This environment "gave Dookhan the freedom to start making and following her own rules."  Even when coworkers began raising red flags about Dookhan, directors at the Hinton lab were "habitually unresponsive" and "severely downplayed Dookhan's major breach in chain-of-custody protocol."  The OIG report concluded that "all samples in which Dookhan was the primary chemist should be treated as suspect and be subject to careful review."

of a drug crime based on a drug analysis conducted by the Hinton

lab.  Charles, 466 Mass. at 65-66.[7]  To address this onslaught of

motions, the Chief Justice of the Superior Court in October,

2012, assigned specific judges in seven counties to preside over

special "drug lab" sessions.  Id. at 65.  To assist these judges

in the adjudication of these cases, the Chief Justice of the

Superior Court in November, 2012, exercised her authority under

Mass. R. Crim. P. 47, 378 Mass. 923 (1979), to appoint five

retired Superior Court judges as "Special Judicial Magistrates

of the Superior Court" to preside over postconviction motions

related to the Hinton lab.  Id. at 66.

In Scott, 467 Mass. at 337-338, we considered the

appropriate legal standard where a defendant, in response to

government misconduct in his or her case, moves to withdraw a

---

[7] These motions were facilitated by a special task force established by the Governor in September, 2012.  The task force, led by attorney David Meier, used data from the department to identify individuals who could have been affected by Dookhan's misconduct.  The task force then shared the lists with prosecutors, defense attorneys, and judges, "so as to enable each of the agencies and offices to respond appropriately."  The task force concentrated on identifying individuals most adversely affected, such as those in custody, awaiting trial, or on probation or parole.  By December, 2012, the task force identified approximately 10,000 individuals who fell in these priority categories and who had to be notified immediately that their cases potentially were affected by Dookhan's misconduct. The task force also produced a more comprehensive list of approximately 40,000 cases in which Dookhan served as a primary or confirmatory chemist.  At the time the task force completed its final report, the criminal investigation of Dookhan and the OIG's review of the Hinton lab were still ongoing.

guilty plea or an admission to sufficient facts to warrant a finding of guilty. We adopted the two-pronged test in Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006), which requires a defendant who seeks to vacate a guilty plea because of government misconduct to show "both that 'egregiously impermissible conduct . . . by government agents . . . antedated the entry of his plea' and that 'the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.'" Scott, supra at 346.

In considering whether the defendant had satisfied the first prong of this test, we concluded that, because Dookhan "made a number of affirmative misrepresentations by signing [certificates of drug analysis (drug certificates)] and testifying to the identity of substances in cases in which she had not in fact properly tested the substances in question," Dookhan's misconduct was "egregious." Id. at 348. We also concluded that, even though there was no indication that any prosecutor knew of her egregious misconduct, id. at 350 n.7, her misconduct is "attributable to the government" for purposes of a motion for a new trial, id. at 350 & n.7, because as a primary and secondary chemist she "participated in the investigation or evaluation of the case" and "reported to the prosecutor's office concerning the case." Id. at 349, quoting Commonwealth v. Martin, 427 Mass. 816, 824 (1998).

We also recognized the dilemma that a defendant would face in attempting to prove that the laboratory analysis in his or her case was tainted by Dookhan's misconduct. See Scott, 467 Mass. at 339, 351-352. We noted that Dookhan acknowledged "that she may not be able to identify those cases in which she tested the samples properly and those in which she did not." Id. at 339. "Thus, even if Dookhan herself were to testify in each of the thousands of cases in which she served as primary or secondary chemist, it is unlikely that her testimony, even if truthful, could resolve the question whether she engaged in misconduct in a particular case." Id. at 352. Because it was "reasonably certain . . . that her misconduct touched a great number of cases," id., but "may be impossible" for any defendant to prove that the drug analysis in his or her case was tainted by her misconduct, id. at 351, we recognized that her "particularly insidious form of misconduct, which belies reconstruction," resulted in "a lapse of systemic magnitude in the criminal justice system." Id. at 352.

To resolve this dilemma, we exercised our power of "general superintendence of all courts . . . to correct and prevent errors and abuses" under G. L. c. 211, § 3, and held that, where Dookhan signed the drug certificate in a defendant's case as an assistant analyst, that is, as the primary or confirmatory chemist, see Scott, 467 Mass. at 353 n.9, a defendant who seeks

to vacate his or her plea after learning of Dookhan's misconduct "is entitled to a conclusive presumption that egregious government misconduct occurred in [his or her] case." Id. at 352. The consequence of the conclusive presumption of egregious government misconduct is that a defendant can satisfy the first prong of the Ferrara test simply by showing that Dookhan signed the drug certificate in his or her case as an assistant analyst. Id. at 353.

We emphasized in Scott that the "special evidentiary rule" of a conclusive presumption is "sui generis" -- "a remedy dictated by the particular circumstances surrounding Dookhan's misconduct" that was "intended to apply only to this narrow class of cases in which a defendant seeks to withdraw his or her guilty plea after having learned of Dookhan's misconduct." Id. at 353-354. We declared that "it is most appropriate that the benefit of our remedy inure to defendants" where, as here, there is "government misconduct that has cast a shadow over the entire criminal justice system." Id. at 352. The remedy of a conclusive presumption, we concluded, takes into account "the due process rights of defendants, the integrity of the criminal justice system, the efficient administration of justice in responding to such potentially broad-ranging misconduct, and the myriad public interests at stake." Id.

We did not relieve a defendant of the burden to satisfy the second prong of the Ferrara test by demonstrating that he or she suffered prejudice by pleading guilty or admitting to sufficient facts without having learned of Dookhan's misconduct, i.e., we did not conclusively presume such prejudice.  Id. at 354-355, 356.  The defendant, therefore, bears the burden of proving "a reasonable probability that he [or she] would not have pleaded guilty had he [or she] known of Dookhan's misconduct," and instead would have chosen to go to trial.  Id. at 355.  We noted that, "[u]nlike evidence of the particular scope of Dookhan's misconduct, evidence of the circumstances surrounding the defendant's decision to tender a guilty plea should be well within the defendant's reach."  Id. at 354 n.11.

In Commonwealth v. Francis, 474 Mass. 816 (2016), we reviewed the denial of a defendant's motion for a new trial where the defendant had been convicted at trial of drug charges after drug certificates were admitted in evidence that were signed by Dookhan as an assistant analyst.  We concluded that the conclusive presumption of "egregious government misconduct" is not limited to motions to withdraw guilty pleas, but that, where the defendant has been convicted at trial, "[t]he consequence of the conclusive presumption is that we deem it error to have admitted the drug certificates or comparable evidence regarding Dookhan's drug analysis where the defendant

had no knowledge of Dookhan's misconduct and therefore no opportunity to challenge the admissibility or credibility of that evidence." Id. at 817.

In Commonwealth v. Ruffin, 475 Mass. 1003, 1003-1004 (2016), we declined to apply the conclusive presumption of "egregious government misconduct" where the defendant had pleaded guilty before Dookhan had signed the drug certificate as an assistant analyst, because her misconduct cannot be said to have affected the defendant's plea where the plea occurred before the misconduct.

Consequently, after our opinions in Scott, Francis, and Ruffin, the defendants who are entitled to the conclusive presumption of "egregious government misconduct" are those who pleaded guilty to a drug charge (or admitted to sufficient facts to warrant a finding of guilty) or who were found guilty of a drug charge at trial after Dookhan signed a drug certificate in

their case as a primary or confirmatory chemist.  We refer to these as the "relevant Dookhan defendants."[8]

In Bridgeman I, 471 Mass. at 473-494, we considered two sets of issues raised by relevant Dookhan defendants who potentially were eligible for relief from their convictions because of Dookhan's misconduct, but who had not yet moved for postconviction relief.  The first set of issues identified concerns that were discouraging these defendants from seeking that relief.  The most significant was the risk that, if their motion for a new trial were granted, the Commonwealth could reprosecute them not only on the charge to which the defendants had pleaded guilty but also on any charge that was dismissed at the time of the plea, and seek a more severe sentence, especially where the dismissed charge carried a mandatory minimum sentence upon conviction.  Id. at 472-473.  Drawing

---

[8] The term "Dookhan defendants" was defined in Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465, 467 n.4 (2015) (Bridgeman I), "to refer generally to those individuals who were convicted of drug offenses and in whose cases Dookhan signed the certificate of drug analysis (drug certificate) on the line labeled 'Assistant Analyst.'"  Because Bridgeman I was decided before Commonwealth v. Ruffin, 475 Mass. 1003 (2016), the term "Dookhan defendants" is broader than the term "relevant Dookhan defendants," because it includes those with cases in which Dookhan signed the drug certificate after their guilty plea or admission to sufficient facts to warrant a guilty finding.  In light of our decision in Ruffin, the set of defendants entitled to the conclusive presumption of egregious government misconduct is limited to the "relevant Dookhan defendants," and the relief we order infra is limited to this set of defendants.

broadly on the need to "ameliorate [the] damaging effects" of Dookhan's misconduct, id. at 474, we held that "a defendant who has been granted a new trial based on Dookhan's misconduct at the Hinton . . . lab cannot be charged with a more serious offense than that of which he or she initially was convicted under the terms of a plea agreement and, if convicted again, cannot be given a more severe sentence than that which originally was imposed."  Id. at 468.

The second set of issues in Bridgeman I concerned the fairness and practicability of attempting individually to resolve the multitude of motions for a new trial that potentially could be brought by the Dookhan defendants.  We allowed the motion to intervene filed by CPCS under Mass. R. Civ. P. 24 (a), 365 Mass. 769 (1974), recognizing that "[i]t has a substantial and immediate interest in these proceedings given its current and future responsibility for providing representation to thousands of indigent Dookhan defendants who want to pursue postconviction relief from their drug convictions."  Bridgeman I, 471 Mass. at 485-486.  We then addressed CPCS's contention that, because so many cases were affected by Dookhan's misconduct, the "time and expense of proceeding on a case-by-case basis has become untenable," and we therefore should implement a "global remedy" to resolve these cases pursuant to our broad powers of superintendence under

G. L. c. 211, § 3. Bridgeman I, supra at 487. Under the global remedy that CPCS proposed, we would vacate the convictions of all Dookhan defendants. Id. CPCS offered two alternatives: we could vacate the convictions with prejudice, and thereby bar any reprosecution; or we could vacate the convictions without prejudice, and allow the Commonwealth one year to reprosecute, dismissing with prejudice all cases not reprosecuted within that time period. Id.

We declined in Bridgeman I to implement a global remedy "at this time." Id. We noted that "while '[i]t certainly is true that we cannot expect defendants to bear the burden of a systemic lapse, . . . we also cannot allow the misconduct of one person to dictate an abrupt retreat from the fundamentals of our criminal justice system.'" Id., quoting Scott, 467 Mass. at 354 n.11. We also noted that we had already provided "meaningful solutions" to resolve these cases in Scott and Charles, and that, in Bridgeman I, we were removing the barriers that made defendants reluctant to file motions to withdraw their guilty pleas. Id. at 480, 487. And we noted that some district attorneys had made progress in providing CPCS with the docket numbers of the cases in which Dookhan was the primary or confirmatory chemist, and encouraged the remaining district attorneys with such cases to assist the single justice in

obtaining docket numbers for their districts.[9]  Id. at 481.  We

recognized that "efforts to provide postconviction relief to

Dookhan defendants [had] been hampered by the inability of CPCS

to ascertain which cases may have been tainted by Dookhan's

misconduct," and that "[t]he ability of CPCS to identify clients

and to assign them attorneys who will represent their interests

in postconviction proceedings is crucial to the administration

of justice in the Hinton . . . lab cases."  Id. at 480.  We

remanded the case to the single justice for further proceedings

consistent with the opinion.  Id. at 494.

The single justice joined as respondents the district

attorneys for the Cape and Islands, Middlesex, Norfolk, and

Plymouth districts, and allowed the motion of the district

attorney for the Bristol district to intervene.  The single

justice ordered the district attorneys to produce lists with the

names, docket numbers, and personal identifying information for

every "adverse disposition concerning every G. L. c. 94C charge"

---

[9] Only the district attorneys for the Suffolk and Essex
districts were parties to Bridgeman I, 471 Mass. at 481.  They
provided CPCS with the relevant docket numbers in their
districts in September, 2014.  Id. at 478 n.20.  The district
attorneys for the Bristol and Norfolk districts later provided
CPCS with the relevant docket numbers before the issuance of the
opinion in Bridgeman I.  Id.  The district attorneys for the
Cape and Islands, Middlesex, and Plymouth districts had yet to
do so at the time that opinion issued.  Id.

of the "Dookhan defendants."[10]  In May, 2016, the district

attorneys produced lists that contained the names of more than

20,000 defendants with more than 24,000 cases where they had

pleaded guilty to a drug charge, had admitted to sufficient

facts to warrant a finding of guilty of a drug charge, or had

been found guilty at trial of a drug charge where Dookhan had

tested the alleged drugs as the primary or confirmatory

chemist.[11]

---

[10] Because the list encompasses the "Dookhan defendants," it
includes some defendants who are not "relevant Dookhan
defendants."  See note 8 and accompanying text, supra.

[11] The lists were the product of the commendable and
laborious efforts of the Trial Court's information technology
department, which identified the set of all cases with a G. L.
c. 94C charge from 2003 to June, 2011, and of the district
attorneys' offices, which then identified the subset of these
cases where Dookhan was the primary or confirmatory chemist.
The district attorneys state that they have identified
approximately 20,544 defendants in 24,577 cases that featured at
least some evidence tested by Dookhan and that resulted in an
adverse consequence.  The CPCS data analyst identified 24,391
cases in which defendants still face adverse dispositions on
drug charges where Dookhan was the primary or confirmatory
chemist.  Both parties contend that the respective tallies are
not a perfect measure of the remaining pool of cases tainted by
Dookhan's misconduct.  As earlier stated, these lists include
defendants who are not relevant Dookhan defendants because they
pleaded guilty or admitted to sufficient facts before Dookhan
signed the drug certificate as an assistant analyst.  The
district attorneys claim that, apart from including the so-
called Ruffin defendants, the lists overcount the number of
relevant Dookhan defendants because they include some defendants
who already moved to vacate their pleas, and because they
include defendants who were codefendants in a case where Dookhan
was an assistant analyst.  The Bridgeman petitioners and CPCS
claim that the lists actually undercount the number of remaining
defendants because of errors in the district attorneys' data.

The single justice also asked the parties to attempt to agree on the content of a letter of notice to the Dookhan defendants informing them that their drug cases had been potentially tainted by Dookhan's misconduct. After the submission of the lists, however, the Bridgeman petitioners and CPCS[12] would not agree to any notice that presumed case-by-case litigation, because they contended that, given the large number of Dookhan defendants and the limited resources of CPCS, the notice could not truthfully inform the Dookhan defendants that attorneys were available to represent them in these cases. They asked the single justice to reserve and report to the full court the question "whether all cases involving misconduct by Annie Dookhan should be dismissed or subjected to a court-ordered deadline." The district attorneys opposed the reservation and report, arguing that the notices would provide all Dookhan defendants the opportunity to seek relief. They also contended

_____

We need not resolve these differences and ascertain the precise number of relevant Dookhan defendants because, even if we were to adopt the district attorneys' estimates, there would still be close to 20,000 relevant Dookhan defendants who might be entitled to postconviction relief.

[12] For the sake of simplicity, we will refer to both the Bridgeman I petitioners and CPCS as the "Bridgeman petitioners" for the remainder of this opinion, even though we recognize that CPCS is an intervener rather than a petitioner in this case. We refer to the "Bridgeman petitioners" because this is a civil case seeking declaratory relief, even though we recognize that the Bridgeman petitioners are each Dookhan defendants in criminal cases.

that the Bridgeman petitioners "significantly overstate[] the apparent degree of interest on the part of the Dookhan defendants in revisiting settled cases."  The single justice issued a reservation and report on August 16, 2016.

The district attorneys advised the single justice before the issuance of the reservation and report that they intended to send notices regardless of whether the case was reported to the full court.  On August 29, 2016, the district attorneys filed in the county court a letter attaching the notice they intended to send on or before September 1.  The Bridgeman petitioners informed the district attorneys that the notice was misleading and poorly translated.  At a hearing on September 6, the single justice invited the district attorneys to delay sending the notice, but the district attorneys announced that the mailing had already begun.  On September 7, CPCS filed an emergency motion asking the full court to halt further dissemination of the notice; the court denied the motion but ordered the district attorneys to keep records of all documents and communications arising from the notice.

The notice was mailed in an envelope with the return address of "RG/2 Claims Administration LLC," and a post office box in Philadelphia, Pennsylvania, along with the words "IMPORTANT LEGAL NOTICE FROM THE COMMONWEALTH OF MASSACHUSETTS"

near the return address.[13]  The notice informed each defendant that, according to court records, he or she was convicted of one or more drug offenses in a specified county between 2003 and 2011; that it has been determined that Dookhan tested the drugs in the case; and that Dookhan "admitted to misconduct in her work at the [Hinton] lab."  It advised the defendant that, because Dookhan tested the evidence, he or she has certain rights, specifically, "the right to challenge the drug conviction(s) listed in this notice" and that "if [the defendant is] tried and convicted again, [he or she] will not face any punishment greater than what [he or she] already received."  The notice asked the defendant to contact his or her original lawyer on the case if he or she has any questions, and also invited the defendant to speak with a new lawyer.  The notice further invited the defendant, should he or she not know how to contact the original lawyer, to get that information at the criminal clerk's office where the case was adjudicated, and provided the Web site address where the physical address of the relevant court can be found.[14]

---

[13] RG/2 Claims Administration, LLC, is the vendor who contracted with the district attorneys to distribute the notice.

[14] The full English text of the notice is reprinted below:

"Dear [recipient]:

A Spanish translation of the notice was included on the bottom of the page. According to the Bridgeman petitioners, this translation "contained numerous errors and was not readily understandable to a person who speaks Spanish but not English."[15]

---

"According to court records, you were convicted of one or more drug offenses in the [county] between 2003 and 2011. It has been determined that chemist Annie Dookhan tested the drugs in your case(s), [court name], [docket number]

"Ms. Dookhan admitted to misconduct in her work at the [Hinton] lab. Because Ms. Dookhan tested evidence in your case, you have certain rights:

"• You have the right to challenge the drug conviction(s) listed in this notice. If your challenge succeeds, your conviction(s) will be undone or 'vacated,' and your case will be returned to active status.
"• The District Attorney's office may decide to try you again on the vacated drug charge(s), but if you are tried and convicted again, you will not face any punishment greater than what you already received. In other words, you cannot be additionally punished for choosing to challenge your conviction(s).

"If you have any questions, please contact your original lawyer on your case(s). You may also choose to speak to a new lawyer. If you do not know how to contact your original lawyer, you may get that information at the criminal clerk's office at the court where your case was handled. Addresses for all of the District and Superior courts can be found at [State government Web site].

"For more information, you may contact the [district attorney's office]."

[15] The Bridgeman petitioners included in the record an affidavit from Michael W. O'Laughlin, a qualified Spanish interpreter, who attested that "the Spanish translation contained within [the notice letter] is not accurate or clear." He identified various flagrant errors in the translation of the notice, including the following:

The district attorneys have not offered any evidence to rebut these claims or to defend the quality of the translation.

The district attorneys' vendor mailed 20,916 letters to Dookhan defendants.[16] The vendor was unable to locate the addresses for 1,006 defendants, and 5,767 of the letters that were sent were returned undelivered. For those letters returned undelivered, the vendor searched for a secondary address and sent out an additional 964 notices. As of October 24, 2016, the over-all response rate to these mailings was extremely low:

- In the Bristol district, where approximately 2,200 cases were identified, the district attorney received thirty-nine telephone calls and three motions were filed.
- In the Cape and Islands district, where approximately 1,300 cases were identified, the district attorney received thirty-nine calls and one walk-in inquiry. No motions were filed.
- In the Essex district, where approximately 4,200 cases were identified, the district attorney received forty-six telephone calls and twelve walk-in inquiries. Seven motions were filed.

---

- The word "vacated" was translated in the notice as "desocupar," meaning to physically vacate premises, not to vacate a judicial decision.
- The verb tense in the same sentence was changed so that it appeared that a successful motion may yield only the possibility that the conviction would be vacated.
- The translation of "criminal clerk's office" described a clerk who is himself also a violent felon.

O'Laughlin also described the translation of a crucial sentence in the notice explaining the district attorney's ability to retry the recipient's case as "unintelligible."

[16] Because some defendants had cases in multiple counties, the number of letters that were mailed exceeded the number of defendants identified in the lists.

- In the Middlesex district, where approximately 3,500 cases were identified, the district attorney received seventy-seven telephone calls and seven walk-in inquiries.  Two motions were filed.
- In the Norfolk district, where approximately 2,300 cases were identified, the district attorney received approximately one hundred inquiries.  Seven motions were filed.
- In the Plymouth district, where approximately 2,000 cases were identified, the district attorney received sixty-five inquiries, including three walk-ins.  One motion was filed.
- In the Suffolk district, where approximately 8,600 cases were identified, the district attorney received 322 telephone calls and walk-in inquiries.  In response, the office has moved to vacate and enter a nolle prosequi in 175 of these cases.  No motions to withdraw a guilty plea or admission to sufficient facts were filed by defendants.

In sum, in response to approximately 21,000 letters sent by the vendor to Dookhan defendants early in September, 2016, as of October 24, 2016, only twenty motions for postconviction relief were filed by defendants and 175 motions were filed by prosecutors.  In other words, the notice triggered applications for postconviction relief in less than one per cent of these cases.[17]

---

[17] The Bridgeman petitioners have filed a motion to expand the record to add an affidavit from Nancy J. Caplan, the CPCS attorney in charge of its Hinton lab crisis litigation unit (unit), which was created in April, 2013, to address indigent defense matters relevant to the representation of Dookhan defendants.  Caplan attests that, after the district attorneys sent the notice, CPCS asked the courts in the eight affected counties and all bar advocates to direct all inquiries arising from the notice to the unit so that CPCS could "provide counsel to indigent Dookhan defendants so long as it had the resources necessary to do so."  She declares that, as of October 31, 2016, the unit had received inquiries arising from the notice from 139 Dookhan defendants, who were defendants in 162 cases in which Dookhan was the primary or confirmatory chemist.

Discussion. The Bridgeman petitioners argue once again for the global remedy that we declined in Bridgeman I, 471 Mass. 487, to implement "at this time." They ask that we vacate the drug convictions of all Dookhan defendants and dismiss them with prejudice or, in the alternative, vacate them without prejudice and allow prosecutors one year to reprosecute the cases, dismissing with prejudice all that are not reprosecuted within one year for violation of the speedy trial rule, Mass. R. Crim. P. 36 (b) (1) (D), as amended, 422 Mass. 1503 (1996). They contend that due process requires such a global remedy because, even though four years have now passed since the scope of Dookhan's misconduct was revealed, the defendants' entitlement to a new trial on their drug convictions has yet to be adjudicated in more than 24,000 cases. They also contend that the notice sent by prosecutors to these defendants was "not a serious effort to ensure that wrongful convictions will be

---

The motion also seeks to expand the record to include a "statement" made by "the District Attorneys for all of the Commonwealth's Districts" in ten separate criminal cases in Hampden County involving misconduct by another chemist, Sonja Farak, at the Department of Public Health's State Laboratory Institute in Amherst. In that "statement," the district attorneys inform the court that the Commonwealth will not contest a finding of "egregious governmental misconduct" by Farak in performing her duties at that laboratory under the two-prong analysis set forth in Commonwealth v. Scott, 467 Mass. 336 (2014). We allow the motion to expand the record, but recognize that the full scope of Farak's misconduct has yet to be determined.

addressed through case-by-case litigation," and was "so misleading and incomplete" that its harm can be undone only by relieving the defendants of the burdens of case-by-case litigation.  They claim that a global remedy is a necessary exercise of our superintendence authority because a case-by-case adjudication of so many cases is "doomed to fail" given the limited resources of the Commonwealth's indigent criminal defense system.

The district attorneys respond that "[t]here is no convincing reason to retreat from the thoughtful remedies-based, workable solution designed by the [c]ourt."  They contend that the notice mailed to the Dookhan defendants was fair, and that the low response to the notice reflects that many defendants "may conclude that they face no adverse impact at all from a closed chapter in their lives," and "feel no urgency" to reopen their case "before an adverse impact actually occurs."  They contend that, in light of the Dookhan defendants' response to that notice, it is apparent that the Bridgeman petitioners have greatly overstated the burden that will arise from case-by-case adjudication of motions for a new trial.  They also argue that we should not vacate the convictions of Dookhan defendants who have not moved to do so, because "mass vacatur would constitute a complete abandonment of the careful weighing of the interests of defendants, the public, and the criminal justice system that

this [c]ourt set out in Scott, and affirmed in [Bridgeman I] and the cases that followed."  They contend that the remedy of dismissal with prejudice is not justified as a matter of law, and that the remedy of dismissal without prejudice, allowing the reprosecution of these cases, would be unfair to impose on defendants who did not move for such relief, because it would subject them without their approval to a new trial and the risk of arrest if they failed to appear.  In short, the district attorneys argue that we should stay the course, because individual case-by-case adjudication of motions for a new trial brought by Dookhan defendants is both practical and fair.

1.  Four relevant principles of our criminal justice system.  In Bridgeman I, 471 Mass. at 487, we recognized that "we cannot expect defendants to bear the burden of a systemic lapse," but we declined to implement a global remedy "at this time" because we would not "allow the misconduct of one person to dictate an abrupt retreat from the fundamentals of our criminal justice system" (citation omitted).  In revisiting here whether the time is now ripe to implement a global remedy, it is important to explain four relevant principles of our criminal justice system that have guided our prior decisions relating to this matter.  First, where there is egregious misconduct attributable to the government in the investigation or prosecution of a criminal case, the government bears the burden

of taking reasonable steps to remedy that misconduct.  See Strickler v. Greene, 527 U.S. 263, 281 (1999) (discussing "special role played by the American prosecutor in the search for truth in criminal trials" and broad duty to disclose exculpatory information); Bridgeman I, supra at 480-481.  Those reasonable steps include the obligation to timely and effectively notify the defendant of egregious misconduct affecting the defendant's criminal case.  See Ferrara, 456 F.3d at 293 (government's failure to disclose exculpatory evidence to defendant "was so outrageous that it constituted impermissible prosecutorial misconduct sufficient to ground the petitioner's claim that his guilty plea was involuntary"); Mass. R. Prof. C. 3.8 (d), as appearing in 473 Mass. 1301 (2016) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . .").

As applied here, prosecutors had a responsibility timely and effectively to disclose Dookhan's misconduct to all affected defendants because Dookhan might erroneously have found substances that were not controlled substances to be a controlled substance, or to be a certain weight, creating the risk that a defendant may have been found guilty of a drug crime he or she did not commit.  In addition, her egregious misconduct

put in question the accuracy of the drug analysis and the ability of the government to prove the nature and weight of the alleged drugs beyond a reasonable doubt, which a defendant is entitled to consider in making an informed and voluntary decision whether to waive the right to trial and plead guilty (or admit to sufficient facts to warrant a finding of guilt), or to proceed to trial. The cost of notifying defendants of egregious government misconduct must be borne by the prosecuting district attorney's office, even if, as here, the fault belongs to the Hinton lab and Dookhan, not the prosecutors.

Second, under our criminal rules, relief from a conviction generally requires the defendant to file a motion for a new trial. See Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001) (judge "upon motion in writing may grant a new trial at any time if it appears that justice may not have been done" [emphasis added]). See also Scott, 467 Mass. at 354. "A new trial motion under Rule 30(b) is the appropriate vehicle to attack the validity of a guilty plea or an admission to sufficient facts." Reporters' Notes to Rule 30 (b), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1774 (LexisNexis 2016).

Third, dismissal with prejudice "is a remedy of last resort." Commonwealth v. Cronk, 396 Mass. 194, 198 (1985). Where a motion for a new trial is allowed, the conviction is

vacated, and the prosecutor may retry the defendant on the same charge, unless the judge, apart from the vacatur, also dismisses the complaint or indictment with prejudice. We have identified "[t]wo parallel legal principles" governing when this last resort might be necessary, balancing the rights of defendants "against the necessity for preserving society's interest in the administration of justice." Id. at 198-199. Under one legal principle, where a prosecutor fails to disclose evidence the defendant is entitled to receive and the defendant is prejudiced by the failure to disclose, a motion to dismiss with prejudice should be allowed only where there is "a showing of irremediable harm to the defendant's opportunity to obtain a fair trial." Id. at 198. Dismissal with prejudice is "too drastic a remedy" if the error can be remedied and the defendant can still obtain a fair trial. Id. at 200, and cases cited.

"Under the alternative principle, prosecutorial misconduct that is egregious, deliberate, and intentional, or that results in a violation of constitutional rights may give rise to presumptive prejudice. In such instances prophylactic considerations may assume paramount importance and the 'drastic remedy' of dismissal of charges may become an appropriate remedy." Id. at 198-199. This alternative principle is narrowly applied; "the only reason to dismiss criminal charges because of nonprejudicial but egregious police misconduct would

be to create a climate adverse to repetition of that misconduct that would not otherwise exist." Commonwealth v. Lewin, 405 Mass. 566, 587 (1989).

We dismissed drug charges with prejudice based on both alternative grounds where two special agents of the United States Drug Enforcement Administration spoke after arraignment with the defendant without the approval of defense counsel, disparaged defense counsel and the manner in which he was conducting the defense, and encouraged the defendant to cooperate with Federal authorities. Commonwealth v. Manning, 373 Mass. 438, 440 (1977). We concluded that this was "a deliberate and intentional attack by government agents on the relationship between Manning and his counsel in a calculated attempt to coerce the defendant into abandoning his defense," id. at 443, and that "the officers' misconduct was so pervasive as to preclude any confident assumption that proceedings at a new trial would be free of the taint," id. at 444. We also concluded that a "stronger deterrent" than a new trial was warranted for this type of misconduct. Id.

In Scott and Francis, the remedy that we found appropriate in cases where a defendant shows prejudice arising from Dookhan's misconduct was the allowance of a motion for a new trial and the vacatur of the conviction. We did not order the dismissal of the defendant's drug charges with prejudice, or

suggest that was an appropriate remedy for Dookhan's misconduct under either of the alternative legal principles.  Although the record does not provide us with data as to the number of relevant Dookhan defendants who were reprosecuted after their motions for a new trial were allowed, we are aware that some defendants were retried and that other defendants later pleaded guilty or admitted to sufficient facts to support a guilty finding.

Fourth, where large numbers of persons have been wronged, the wrong must be remedied in a manner that is not only fair as a matter of justice, but also timely and practical.  Cf. Green v. County School Bd. of New Kent County, 391 U.S. 430, 439 (1968) (in redressing school desegregation, school board must "come forward with a plan that promises realistically to work, and promises to realistically work now").  A remedy that is perfect in theory is not perfect in fact if it would take too long to be accomplished, or if the resources required to implement it would overwhelm the limited resources available to the courts.  See Hilao v. Estate of Marcos, 103 F.3d 767, 786 (9th Cir. 1996) (affirming special master's award of compensatory damages based on statistical methods to determine amount owed to class of nearly 10,000 victims and survivors of decedents who were tortured, executed, or "disappeared" by Philippine military or paramilitary groups during fourteen-year

rule of Ferdinand E. Marcos where "the time and judicial resources required to try the nearly 10,000 claims in this case would alone make resolution of Hilao's claims impossible"). Even when the number of persons injured is large and the problem is complex, courts endeavor to craft a workable remedy; we do not throw up our hands and deny relief because it would be too difficult to accomplish. Cf. Brown v. Plata, 563 U.S. 493, 511 (2011) (in addressing prison overcrowding, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of [executive] administration"); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 28 (1971) (when altering school attendance zones to prevent racial segregation, "all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made"). Over the course of its history, our judiciary has devised ways to provide redress to widespread wrongs through such vehicles as class actions, derivative actions, the consolidation of multiple related cases, and the appointment of special masters and receivers. See, e.g., Mass. R. Civ. P. 23, as amended, 471 Mass. 1491 (2015) (class actions); Mass. R. Civ. P. 23.1, 365 Mass. 768 (1974) (derivative actions by shareholders); Mass. R. Civ. P. 42, as amended, 423 Mass. 1406 (1996) (case consolidation); Mass. R. Civ. P. 53, as amended, 423 Mass. 1408 (1996) (appointment of

special master).  In short, we as a judiciary must and do find ways to make justice not only fair but workable.  See Demoulas v. Demoulas, 428 Mass. 555, 580 (1998), citing 1 D. Dobbs, Remedies § 2.1(3), at 63 (2d ed. 1993) ("Equitable remedies are flexible tools to be applied with the focus on fairness and justice").

2.  Revisiting the need for a global remedy.  We now consider, in light of all that has happened and all that we have learned since Bridgeman I, whether we should revisit our decision to decline to adopt a global remedy "at this time" to resolve the cases of the relevant Dookhan defendants. Bridgeman I, 471 Mass. at 487.

a.  The district attorneys' proposal to stay the course. The district attorneys contend that our previous decisions have provided an adequate remedy to the relevant Dookhan defendants. This argument relies on the key premise that the notice mailed to the Dookhan defendants adequately informed them that Dookhan's misconduct affected their criminal case and that, as a result, they may seek to vacate their drug conviction.

We reject this premise; we agree with the Bridgeman petitioners that the notice sent by the district attorneys was wholly inadequate to provide the relevant Dookhan defendants with the information necessary to knowingly and voluntarily decide whether they should explore with counsel the possibility

of withdrawing their plea or moving for a new trial. The shortcomings begin with the envelope itself, which identified the source of the letter as "RG/2 Claims Administration LLC," a source that would appear inconsistent with the words on the envelope, "IMPORTANT LEGAL NOTICE FROM THE COMMONWEALTH OF MASSACHUSETTS." Such an envelope invites the risk that the notice might be unopened and discarded as "junk mail."

Among the shortcomings of the letter itself are that it failed adequately to inform the Dookhan defendants that the Supreme Judicial Court has determined that they are entitled to a conclusive presumption that the drug analysis in their case was tainted by egregious government misconduct. Nor did it adequately inform them that, as a result, this court has determined that they are entitled to withdraw their guilty plea[18] on drug charges if they can show a reasonable probability that they would not have pleaded guilty, and instead would have decided to go to trial, had they known of Dookhan's misconduct.

---

[18] We recognize that recipients of the letter include both individuals who pleaded guilty to Dookhan-related charges and those who admitted to sufficient facts to warrant a guilty finding. Because such an admission is the "functional equivalent of a guilty plea" under G. L. c. 278, § 29D, and because it exposes a defendant to some of the same collateral consequences as a guilty plea, see Commonwealth v. Villalobos, 437 Mass. 797, 800 (2002), we treat the admission the same as a guilty plea for the purposes of a motion for new trial. Luk v. Commonwealth, 421 Mass. 415, 418 n.6 (1995). In the remaining discussion we refer to a guilty plea and an admission to sufficient facts to warrant a finding of guilty, collectively, as a "guilty plea." See Scott, 467 Mass. at 337 n.1.

Nor did it adequately inform them that, if they had been convicted of a drug charge at trial, they are entitled to a new trial if the admission in evidence of their drug analysis might have significantly influenced the jury in reaching their verdict.  The letter explained that, if their challenge to their drug conviction were to succeed, their conviction would be vacated and their "case will be returned to active status," but did not explain what it meant for their case to be on "active status."[19]  The Spanish translation of the letter is so poor that the letter might not be understood by persons who speak only Spanish.

The letter also failed to inform the Dookhan defendants that they had a right to counsel if they sought to withdraw their plea or move for a new trial and that, if they could not afford counsel, one would be appointed for them.  Instead, it invited them to speak to their original lawyer on the case and, if they did not know how to contact that lawyer, invited them to obtain that information from the relevant criminal clerk's office.[20]  The letter also invited them to contact the office of the district attorney who prosecuted them "[f]or more

---

[19] The letter did explain that, if the district attorney decided to try them again on the vacated drug charge, they would not face punishment greater than what they had earlier received if they were convicted.

[20] The letter also told recipients that they "may also choose to speak to a new lawyer."

information."  It did not provide a telephone number for CPCS or for any other entity that conducts criminal defense.

Apart from the deficiencies in the notice, we know that a substantial number of the Dookhan defendants did not receive the letter, because 5,767 were returned as undeliverable.  An additional 964 notices were sent to secondary addresses for these individuals in an attempt to locate them, but we do not know how many of these letters were returned as undeliverable.  No public notice, either through the newspaper, television, or social media, was attempted to provide notice to those whose current address could not be located.

We are skeptical of the district attorneys' explanation that so few of the Dookhan defendants chose to respond to the letter because most were not interested in "reopening a closed chapter in their lives before an adverse impact actually occurs" and others believed that "they face no adverse impact at all" from this conviction.  We recognize that few, if any, of the relevant Dookhan defendants continue to be incarcerated on a drug conviction tainted by Dookhan's misconduct, but that does not mean that they lack a strong reason to seek to have this conviction vacated, given the serious and pervasive collateral consequences that arise from a drug conviction.  A noncitizen, even one lawfully residing in this country, who is convicted of any crime "relating to a controlled substance," which includes

the crime of possession of heroin, cocaine, or more than thirty grams of marijuana, is "deportable."  8 U.S.C. § 1227(2)(B)(i) (2012).  See Padilla v. Kentucky, 559 U.S. 356, 368 (2010); Commonwealth v. DeJesus, 468 Mass. 174, 175 (2014).  All persons, including United States citizens, who are convicted of drug crimes may be barred from public housing and from Federal- and State-subsidized private housing.  See 42 U.S.C. § 13661 (2012); 24 C.F.R. §§ 960.204(a)(1), 982.553(a)(1), (2)(ii); G. L. c. 121B, § 32 (State-funded public housing); 760 Code Mass. Regs. § 5.08(1)(d) (1996); 760 Code Mass. Regs. § 49.03(2)(f) (2012) (Massachusetts Rental Voucher Program); 803 Code Mass. Regs. § 5.04 (2012).  A drug conviction may bar a defendant from many categories of jobs and professional licenses.  See, e.g., G. L. c. 6, §§ 172 (c), 172A-172M.  See also Commonwealth v. Pon, 469 Mass. 296, 317 (2014) (collateral consequences include homelessness and unemployment).  It may also prevent a defendant from receiving government benefits such as cash assistance and unemployment benefits.  See G. L. c. 151A, § 25 (e) (unemployment benefits); 106 Code Mass. Regs. § 701.110(D) (2016) (cash assistance under transitional aid to families with dependent children program).  And it may render a student temporarily ineligible for Federal financial aid, thereby diminishing a defendant's ability to attend college.  20 U.S.C. § 1091(r)(1) (2012).  A conviction of drug trafficking

results in the automatic suspension of the defendant's driver's license, which makes it more difficult to find and keep employment.  G. L. c. 90, § 22½, inserted by St. 2016, c. 64, § 1.  A prior drug conviction may also result in a lengthy minimum mandatory sentence for those subsequently convicted of additional drug offenses, G. L. c. 94C, §§ 32 (b), 32A (b), 32B (b), 32C (b), 32D (b), 34, or of the illegal possession of a firearm.  G. L. c. 269, § 10G.  In short, the adverse consequences of an unjust conviction do not end when one completes a jail or prison term, or a probationary period.  Given the inadequacy of the notice provided by the district attorneys, the remarkably low response to that notice, and the severe collateral consequences of drug convictions, justice and fairness do not permit us simply to stay the course set in Bridgeman I.

b.  The Bridgeman petitioners' proposal for a global remedy.  The Bridgeman petitioners contend that, even with adequate notice, no remedy premised on case-by-case adjudication can work.  They argue that, because of the severely limited resources of CPCS -- the amount of State funding, the number of qualified bar advocates, and the legislative limits on the number of hours that bar advocates annually may bill to CPCS -- CPCS cannot possibly assign qualified counsel to represent all the defendants who would file the postconviction motions that

would result from truly adequate notice. They therefore contend that it is both illusory and misleading to inform defendants that, if they are indigent, counsel will be assigned to represent them, where that will simply not be possible. They contend that the only just and practical alternative under these circumstances is the global remedy they propose, in which we would vacate the drug convictions of all relevant Dookhan defendants and dismiss them with prejudice, or dismiss them without prejudice and allow prosecutors one year to reprosecute these cases before they, too, would be dismissed with prejudice.

The proposed global remedy, however, is neither as just nor as practical as the Bridgeman petitioners claim, and it would be inconsistent with some of the principles that we earlier articulated. In Scott and Francis, we granted relevant Dookhan defendants a conclusive presumption of egregious government misconduct, but we did not grant them a conclusive presumption of prejudice; defendants still bore the burden of proving prejudice. Where a relevant Dookhan defendant filed a motion to withdraw a plea or for a new trial, and failed to prove prejudice, the motion was denied. The global remedy proposed by the Bridgeman petitioners would effectively declare a conclusive presumption of prejudice.

Even where a relevant Dookhan defendant proved prejudice, the defendant only obtained a new trial under Scott and Francis,

not a dismissal with prejudice. Dookhan's conduct, serious as it was, did not result in "irremediable harm to the defendant's opportunity to obtain a fair trial." Cronk, 396 Mass. at 198. Rather, it meant that the Commonwealth had to retest the substance claimed to be a controlled substance and offer evidence of that new drug analysis at a retrial, or otherwise prove that the substance possessed or distributed by the defendant was a controlled substance. Nor, given the absence of any evidence of misconduct by a prosecutor or investigator, did we place Dookhan's misconduct in the category that requires a stronger deterrent than a new trial to avoid the risk of repetition. See Lewin, 405 Mass. at 587; Manning, 373 Mass. at 444. A dismissal with prejudice for government misconduct is very strong medicine, and it should be prescribed only when the government misconduct is so intentional and so egregious that a new trial is not an adequate remedy. We did not prescribe this medicine in Scott and Francis, and we are not convinced that it is appropriate to do so now. And if we were to prescribe it now, we would equitably have to address the claims of those who earlier prevailed in proving prejudice and therefore won a new trial, but not a dismissal with prejudice, and subsequently either again pleaded guilty to the same or lesser charges or were convicted at a new trial of the drug charges. They could

justly contend that they are as entitled to a dismissal with prejudice as are those who did not move for a new trial.

To vacate the convictions of all relevant Dookhan defendants without prejudice would present other problems of justice and practicality. We require a defendant to move for a new trial for a reason -- without a motion, we cannot be sure that a defendant wishes to accept the risk that the Commonwealth will retry the defendant rather than issue a nolle prosequi. Even though, as a result of our decision in Bridgeman I, 471 Mass. at 477, a defendant at a new trial would not be risking conviction of a more serious crime or a longer sentence, a defendant who is retried would still have to appear in court when directed by the judge and endure the uncertainty and disruption inherent in being a defendant in a criminal trial. We might be skeptical of the district attorneys' contention that most of the relevant Dookhan defendants do not wish to reopen "a closed chapter in their lives," but it would not be surprising if some defendants have no wish to relitigate their earlier criminal cases and instead simply want to move on with their lives.

Although we reject the global remedy proposed by the Bridgeman petitioners, we accept two premises of their argument. First, in light of the unusual circumstances of the relevant Dookhan defendants, all who are indigent and wish to explore

whether to move for a new trial under Mass. R. Crim. P. 30 (b) are entitled to appointed counsel. We recognize that we have declared that "an indigent defendant does not have an absolute right under any provision of the United States Constitution or the Massachusetts Declaration of Rights to appointed counsel in preparing or presenting his motion for a new trial." Commonwealth v. Conceicao, 388 Mass. 255, 261 (1983). But we have also declared that the State must "ensure that indigent defendants have meaningful access to this postconviction proceeding," id., and that, "when a defendant presents a motion for a new trial which raises a colorable or meritorious issue, 'it is much the better practice to assign counsel.'" Id. at 262, quoting Dillon v. United States, 307 F.2d 445, 448 (9th Cir. 1962).

Generally, the decision whether to appoint counsel to represent a defendant in preparing and presenting a motion for a new trial rests with the sound discretion of the motion judge. Mass. R. Crim. P. 30 (c) (5), as appearing in 435 Mass. 1501 (2001). But in the exercise of that discretion a judge should appoint counsel where the failure to do so would deprive an indigent defendant "of meaningful access" or result in "fundamental unfairness." Conceicao, supra at 262, citing Ross v. Moffitt, 417 U.S. 600, 616 (1974), and Lassiter v. Department of Social Servs., 452 U.S. 18, 24-25 (1981).

Here, all of the relevant Dookhan defendants who move for a new trial are entitled under our decision in Scott to a conclusive presumption of egregious government misconduct. The district attorneys concede that, given the number of relevant Dookhan defendants, we have the authority under our superintendence power to order that each relevant Dookhan defendant who is indigent is entitled to the assignment of counsel. We so order; we need not wait for each motion judge to rule individually on the question of the assignment of counsel where it is plain that the absence of counsel under these unusual circumstances would deny an indigent defendant "meaningful access" or result in "fundamental unfairness," and therefore deprive the defendant of his or her constitutional rights to due process and to counsel. The right to appointed counsel applies here regardless of whether the relevant Dookhan defendant has completed his or her sentence, because the severe collateral consequences arising from a drug conviction do not end at the conclusion of a defendant's sentence.

Moreover, where an indigent criminal defendant has a right to counsel, "[t]he duty to provide such counsel falls squarely on government, and the burden of a systemic lapse is not to be borne by defendants." Lavallee v. Justices in the Hampden Superior Court, 442 Mass. 228, 246 (2004). Where a judge finds that a criminal defendant has a right to counsel and is indigent

(or indigent but able to contribute), the judge assigns CPCS to provide representation for the party.  S.J.C. Rule 3:10, § 6, as appearing in 475 Mass. 1301 (2016).  G. L. c. 211D, § 5 (CPCS "shall establish, supervise and maintain a system for the appointment or assignment of counsel" at any stage of criminal proceeding where there is right to counsel and defendant is indigent).  If CPCS, despite its best efforts, were unable to assign counsel to a defendant in a reasonably timely manner -- whether the reason be the absence of necessary funding by the Legislature, the inability of CPCS to qualify adequate numbers of private attorneys to serve as bar advocates because of the low hourly fee mandated by the Legislature,[21] the unavailability of qualified bar advocates because of the limitation on the

---

[21] The present statutory hourly rate for bar advocates is fifty-three dollars for cases in the District Court and the Boston Municipal Court, and sixty dollars for nonhomicide cases in the Superior Court.  G. L. c. 211D, § 11 (a).  The only change to these hourly rates since 2005 has been that the rate applicable for cases in the District Court and Boston Municipal Court was increased from fifty dollars to fifty-three dollars in 2015.  See St. 2015, c. 46, § 119.

number of hours they may bill annually,[22] or a systemic overload

created by an overwhelming number of relevant Dookhan defendants

filing motions for a new trial (or the combination of all four

reasons) -- we would have to fashion an appropriate remedy under

our general superintendence authority for the constitutional

violation suffered by indigent criminal defendants.  See

Lavallee, supra at 244.  In Lavallee, where the list of CPCS-

qualified attorneys available to accept assignments in Hampden

County was inadequate to ensure the provision of counsel to

those with a right to counsel, the remedy we ordered was that a

criminal case against an indigent defendant must be dismissed

without prejudice if an attorney had not filed an appearance

within forty-five days of arraignment.  Id. at 246.

We recognize that, if a substantial percentage of relevant

Dookhan defendants were to seek postconviction relief after

---

[22] The annual cap on billable hours for bar advocates is 1,650 hours, and a bar advocate may not accept any new appointment in a nonhomicide case after having billed 1,350 hours in that fiscal year.  G. L. c. 211D, § 11 (b), (c).  In 2016, in response to a shortage of bar advocates in care and protection cases and children and family law cases, the Legislature enacted legislation allowing the chief counsel of CPCS, under certain circumstances, to waive the annual cap on billable hours for bar advocates assigned to these cases, provided that such a bar advocate not bill in excess of 1,800 billable hours for the year.  G. L. c. 211D, § 11(d), amended through St. 2016, c. 133, § 119.  A comparable increase in the annual cap on billable hours potentially could be enacted for bar advocates assigned to criminal cases or, alternatively, the time devoted to the representation of relevant Dookhan defendants could be exempted from the annual cap.

receiving truly adequate notice, the capacity of CPCS to assign qualified attorneys to represent these defendants in case-by-case adjudication would soon be overwhelmed. Therefore, unless the district attorneys were to move to vacate and dismiss with prejudice the drug convictions of large numbers of relevant Dookhan defendants, case-by-case adjudication poses the considerable risk that the demand of indigent Dookhan defendants for counsel might outstrip the supply of CPCS-qualified attorneys to represent them, and require this court to implement an appropriate remedy under our general superintendence authority for the constitutional violation suffered by indigent criminal defendants who are denied their right to counsel. If past is prologue, that remedy will likely be the dismissal without prejudice of their challenged drug convictions. See Lavallee, 442 Mass. at 246.

c. New protocol for case-by-case adjudication. The extraordinary magnitude of Dookhan's misconduct has left us with only poor alternatives. We continue to believe that, despite its considerable risks and burdens, case-by-case adjudication is the fairest and best alternative to resolve the drug cases potentially tainted by Dookhan's misconduct and the alternative most consistent and in harmony with the relevant principles of criminal justice that have and continue to guide us in this extraordinary situation. But we recognize that, in light of the

potential need to adjudicate more than 20,000 motions for a new trial brought by the relevant Dookhan defendants, case-by-case adjudication must be adapted to make it both fair and workable.

The success of case-by-case adjudication will depend on the cooperation of the district attorneys, who will have to examine each drug conviction of each relevant Dookhan defendant in their district and determine which cases they reasonably could and would reprosecute if a motion for a new trial were granted, and move to vacate and dismiss with prejudice the rest.[23] We rely on the exercise of the district attorneys' sound discretion to reduce substantially the number of relevant Dookhan defendants. We note that it appears that the majority of the drug convictions of relevant Dookhan defendants were of possession

---

[23] In a letter to the Governor on September 6, 2012, after learning of the investigation of the Hinton lab, the district attorneys declared, "If there has been any miscarriage of justice due to the actions of Annie Dookhan or anyone else at the [Hinton lab], correcting those miscarriages must be the first priority." Press Release, MDAA Letter to Gov. Patrick Re: DPH Drug Lab, State House News Serv. (Sept. 11, 2012). At oral argument, the district attorneys similarly assured the court that they will exercise their sound discretion in handling motions for a new trial brought by the relevant Dookhan defendants.

alone,[24] that approximately ninety per cent of these convictions were obtained in the District Court or in the Boston Municipal Court (which means that the drug charges were either misdemeanors or felonies for which the district attorney did not choose to seek indictments), and that virtually all of these defendants have already served the entirety of their sentences for these drug convictions.

Its success also depends on the cooperation of CPCS, which will have to make best efforts in using the funding appropriated by the Legislature to assign counsel to the relevant Dookhan defendants who, after new notice, choose to explore the filing of a motion for a new trial. We look to CPCS also for its creativity and ingenuity in finding ways to assign attorneys to represent as many relevant Dookhan defendants as is reasonably possible.

To accomplish case-by-case adjudication of the drug cases of potentially more than 20,000 relevant Dookhan defendants, we establish the following protocol, to be completed in three

---

[24] An analysis conducted by Paola Villarreal, a data science fellow at the American Civil Liberties Union Foundation of Massachusetts, revealed that approximately sixty-two per cent of the adverse drug dispositions for Dookhan defendants were for possession alone. At oral argument, in answer to a question posed by a Justice, a prosecutor stated that he "[did] not know" whether a majority of these cases were for "straight possession."

phases, and order its implementation by the single justice in the form of a declaratory judgment.

i. Phase one. Upon the issuance of this opinion, each district attorney shall commence an individualized review of every Dookhan case in his or her district that was included on the list that the district attorney earlier submitted to the single justice. No later than ninety days after the issuance of this opinion, each district attorney shall file three letters with the county clerk.[25]

The first letter shall identify all defendants on the list who are not relevant Dookhan defendants because they pleaded guilty to a drug charge before Dookhan signed the drug certification and therefore are not entitled to the conclusive presumption of egregious government misconduct. In short, this letter shall identify all of the so-called Ruffin defendants. See Ruffin, 475 Mass. at 1003.

The second letter shall identify all of the drug convictions on the list that the district attorney moves to vacate and dismiss with prejudice as a result of his or her individualized review. These shall include both the convictions that the district attorney wishes to vacate and dismiss with prejudice, regardless of whether the case could be successfully

_____

[25] We recognize the difference between the date of the issuance of our opinion and the date of the rescript, and have specifically selected the former as the starting date.

reprosecuted if a new trial were ordered, and the convictions that the district attorney could not successfully reprosecute if a new trial were ordered. Once these drug convictions are vacated and dismissed with prejudice, the defendants shall be notified of the action taken.[26]

The third letter shall identify all drug convictions on the list that the district attorney does not move to vacate and dismiss with prejudice. For each such conviction, the district attorney shall certify that, if a motion for a new trial were allowed, the district attorney could produce evidence at a retrial, independent of Dookhan's signed drug certificate or testimony, sufficient to permit a rational jury to find beyond a reasonable doubt that the substance at issue was the controlled substance alleged in the complaint or indictment. Such independent evidence may include, for example, retesting of the original drug evidence, a positive field test, or a specific admission by the defendant regarding his or her knowledge of the nature of the substance that was made before Dookhan signed the drug certificate in the case. Only the relevant Dookhan defendants identified in the third letter shall be provided with new notice in phase two, discussed infra.

---

[26] Where a defendant pleaded guilty to multiple charges at a plea hearing or was convicted at trial of multiple counts, the vacatur of these drug convictions with prejudice will not affect any nondrug convictions or any drug convictions where Dookhan was not the primary or confirmatory analyst.

In light of the massive number of relevant Dookhan defendants and the scope of misconduct attributable to the government (albeit not to the prosecutors), it is only fair that district attorneys make an individualized determination whether a conviction warrants burdening the court system with the adjudication of a motion for a new trial, CPCS with the assignment of counsel for those who are indigent, and the taxpayers with payment for the notice and for assigned counsel, especially where a defendant has already served the entirety of the sentence.  A substantial vetting of the relevant cases by the district attorneys will allow our criminal justice system to focus its limited resources where they are most needed, and diminish the risk that the number of these cases will so overwhelm CPCS that the single justice will have to act to protect the relevant Dookhan defendants' right to counsel.[27]

---

[27] Our focus in the phase one protocol on whether the Commonwealth could obtain a drug conviction against the relevant Dookhan defendants with evidence untainted by Dookhan's misconduct is comparable to the approach taken by New Jersey courts following revelations of misconduct by a police officer who made numerous drunk driving arrests.  In State v. Gookins, 135 N.J. 42, 44-45 (1994), three defendants moved to vacate their guilty pleas for driving while under the influence of alcohol after the police officer involved in their arrests and the administration of their breathalyzer tests was convicted of falsifying the result of the breathalyzer test he had performed on an undercover agent, and of stealing money from drivers whom he had stopped.  The defendants had pleaded guilty in reliance on the results of their breathalyzer tests.  Id. at 45.  The New Jersey Supreme Court vacated their convictions and issued an order requiring the prosecution to certify to the trial court

ii.  Phase two.  In the second phase of the protocol, no later than thirty days after the expiration of the ninety-day period in phase one, new notice shall be provided to all relevant Dookhan defendants identified in the district attorneys' third letters.  The notice shall consist of a mailing that is approved by the single justice as to its content, its envelope, and its mode of delivery.[28]  The single justice shall also have the authority to order additional forms of public notice, such as through newspapers or social media, to enhance the effectiveness of the mailing and to attempt to reach those who might not receive it.

---

"all the evidence that it considers to be untainted that would sustain the prosecution of these cases, . . . excluding the testimony of [the convicted officer]."  Id. at 51.  The trial court was instructed to hold a hearing "to determine whether such evidence is sufficient to permit the State to proceed with the case."  Id. at 52.  In a separate class action in the United States District Court, the State consented to the appointment of a special master to review all drunk driving cases of class members involving the convicted officer and determine whether those convictions should be reversed.  Id. at 51.  The special master conducted an individualized review of these cases and determined that "the only evidence inculpating the [defendants] came from a police officer known to be corrupt."  See Dickerson vs. Kane, U.S. Dist. Ct., No. 92-2528 (D.N.J. July 17, 1995).  The District Court judge adopted the findings of the special master and ordered the reversal of 151 drunk driving convictions.  Id.

[28] We leave to the single justice the question whether certified mail or some other comparable means of delivery is appropriate to determine whether the defendant actually receives the notice.

The new notice shall not only address the deficiencies described in the content of the first written notice sent by the district attorneys, but also simplify the process for defendants to move for a new trial. The notice should identify the telephone number of a "hotline" staffed by CPCS, so that persons who receive the notice can seek immediate guidance. The mailing should permit a relevant Dookhan defendant to declare, simply by checking a box, that the defendant wishes to discuss with counsel whether the defendant should attempt to vacate his or her drug conviction by filing a motion for a new trial, and should also include a form indigency affidavit for the defendant to fill out if he or she claims to be indigent and therefore qualifies for the assignment of counsel. CPCS is encouraged to draft and include within the mailing a separate letter providing the legal guidance and information that CPCS would generally provide to a relevant Dookhan defendant who would telephone its hotline. Because this guidance letter, unlike the notice, constitutes legal advocacy and not simply legal information, and might encourage relevant Dookhan defendants to move for a new trial to eliminate the collateral consequences arising from their drug conviction, the content of this letter shall not require the approval of the single justice. Along with the notice, the guidance letter, the check-off sheet, and the form indigency affidavit, the mailing shall include a stamped, self-

addressed envelope so that, once completed, the documents may be returned to an address designated by the single justice. Where a relevant Dookhan defendant returns the documents indicating that he or she is indigent and wishes to explore with counsel the filing of a motion for a new trial, the single justice shall make an indigency determination and, where indigency is found, shall order CPCS to assign counsel to the defendant. No action shall be taken regarding any relevant Dookhan defendant's conviction where he or she does not return the documents or otherwise move for a new trial.

The single justice shall also address the challenge created by the substantial number of relevant Dookhan defendants who have yet to be successfully located. As it stands now, these defendants have yet to be informed that the substance at issue in their case was tested by Dookhan in the Hinton lab, that Dookhan's misconduct over many years has been found to be egregious government misconduct, and that they are entitled to the conclusive presumption of egregious government misconduct if they were to move for a new trial. Because they have not yet been so informed, they effectively have been denied the opportunity to seek redress for this misconduct.

The district attorneys have an obligation to take all reasonable steps necessary to provide these individuals with notice of Dookhan's misconduct, and that includes reasonable

efforts to locate them, wherever they might be residing.  Where, despite reasonable efforts, the district attorneys are unable to obtain an address for a relevant Dookhan defendant, or where the notice is returned as undeliverable, the single justice shall direct the relevant district attorney to locate the current address of the defendant's last attorney of record in the case. The notice and accompanying documents shall be sent to that attorney, with a cover letter asking the attorney to make best efforts to locate his or her former client so that effective notice can be accomplished.  In addition, the single justice shall have the authority to direct the probation department to include a notation in the missing defendant's board of probation record indicating that the defendant is a relevant Dookhan defendant, so that the defendant can receive the required notice and related documents if he or she returns to court.  For the relevant Dookhan defendants who cannot otherwise be located, the single justice shall also have the authority to order the use of social or other media to provide the notice and related documents, or information regarding them.

The financial burden of notifying defendants of egregious government misconduct that affected their criminal cases must be borne by the prosecuting district attorney's office, even if, as here, the fault belongs to the Hinton lab and Dookhan, not the prosecutors.  Therefore, the cost of providing new and adequate

notice, including but not limited to the cost of mailing, of locating missing defendants, and of publicity through social and other media, shall be borne by the district attorneys, with the allocation of those costs to be determined by the single justice. We recognize that this cost could be considerable, but that is a consequence of egregious government misconduct that affected more than 20,000 defendants. We also note that a district attorney may reduce the amount of this cost by reducing the number of defendants identified in the third letter. The failure of a district attorney to bear the district's proportionate share of these costs shall be deemed equivalent to a failure to provide defendants with exculpatory information, with the sanctions appropriate to such a failure.

iii. Phase three. In the third phase, CPCS shall identify in writing to the single justice all cases, if any, where CPCS received an order for the assignment of counsel, but was unable within sixty days of the order to assign counsel despite CPCS's best efforts. The single justice shall then make a factual finding, after hearing, whether CPCS has made best efforts to assign counsel in these cases. In those cases where the single justice makes such a finding, the single justice shall issue an order to show cause why the drug conviction of this unrepresented defendant should not be vacated, and set a date for a show cause hearing where the Commonwealth will have an

opportunity to be heard. At or after that hearing, if the single justice determines that relevant Dookhan defendants have been denied their right to counsel because of the inability of CPCS, despite its best efforts, to assign counsel to represent the defendants, the single justice may order that the drug convictions at issue be vacated and dismissed without prejudice, unless the interests of justice otherwise dictate.[29] See Lavallee, 442 Mass. at 246.

Conclusion. The case is remanded to the single justice for the entry of a declaratory judgment as provided in this opinion and for further action consistent with this opinion.[30]

So ordered.

---

[29] We recognize our authority to appoint a special master to assist the single justice in his or her exercise of our superintendence authority in these cases. See S.J.C. Rule 2:13, as appearing in 382 Mass. 749 (1981).

[30] Because we recognize the challenges involved in implementing the three-phase protocol, the single justice is authorized to make necessary revisions if any part of it is determined to be impracticable. In addition, if this protocol for any reason were to prove inadequate in practice to remedy the wrong despite the best efforts of the parties, the single justice may issue a new reservation and report to the full court.

LENK, J. (concurring, with whom Budd, J., joins).  It has been over five years since the stunning misconduct of a rogue chemist at the State's William A. Hinton State Laboratory Institute (Hinton lab) first came to light.  The nature, scope, and adverse consequences of that misconduct on the individuals directly affected, on our system of justice, and on the taxpayers who must foot the bill for this lamentable turn of events are all ably recounted in the court's opinion, as well as in the dissenting opinion.  I write separately to underscore that, in those five years, and despite the time and efforts of so many, we have managed to address fewer than 2,000 of the estimated 20,000 or more cases involving Annie Dookhan-tainted evidence.  We cannot go on this way.

Even as we speak, the myriad ripple effects of one woman's misdeeds continue to afflict the relevant Dookhan defendants, thousands and thousands of whom already have served their time for convictions that we now know to be suspect.  As a result of having a prior drug conviction, many of those same people, some of whom may not even know to this day of Dookhan's fateful role in their lives, may now find themselves unable to get work or housing, obtain or keep needed professional and drivers' licenses, attend college, receive government benefits, or even stay in this country.  Mindful of this, I share the dissenting Justice's frustration with the unacceptably glacial systemic

response to date and join in her view that extraordinary measures are now in order.  For reasons explained in the court's opinion, however, I regard the protocol announced today (Bridgeman II protocol) as promising to be such a measure, but only if implemented in a manner that countenances no further delays.  For the protocol to achieve its goals and end this "blight on the integrity of our criminal justice system," post at    , there must be strict compliance with its stringent timelines and requirements.  Only this will forestall the need for a "Bridgeman III" and different measures.

While blame for the difficult situation in which we find ourselves lies solely with Dookhan and the Hinton lab that allowed it to happen -- and it cannot be said too many times that fault most certainly does not lie with the prosecutors who, without knowing its tainted provenance, in good faith used the evidence Dookhan created -- we consistently have recognized that her misdeeds must be attributed to the government, and that the government must bear the responsibility to put things right.  Just as the success of the Bridgeman II protocol will depend on its timely and rigorous implementation, so too will its viability turn, at least initially, on the willingness of the district attorneys promptly to dismiss with prejudice a truly significant number of the roughly 20,000 relevant Dookhan defendants' cases -- at a minimum, those for simple possession in which

sentences already have been served.  See <u>ante</u> at note 24.   Not doing so in the first phase of the protocol will of necessity add to the already staggering human and financial costs of the scandal and risk overloading the already strained public defense system.  In this regard, we cannot turn a blind eye to the potential costs of the looming crisis of thus far undetermined magnitude caused in western Massachusetts by Sonja Farak, yet another rogue chemist employed by a State laboratory.  And, as to the presumably limited number of remaining cases that  the district attorneys decline to dismiss, truly informative notice to the defendants involved, using whatever modes of communication will be effective, is vital to achieving the fair and workable outcome contemplated by the protocol.

Recognizing what Dr. Martin Luther King, Jr., once called "the fierce urgency of now," we must act swiftly and surely to staunch the damage and to make things as right as we can.  The <u>Bridgeman II</u> protocol draws upon the deep roots of our jurisprudence to craft a response that, consistent with fundamental principles, will bring this deplorable episode forthwith to a just resolution once and for all.  May it be so.

HINES, J. (dissenting).  The petitioners and intervener (collectively, petitioners) are before this court once again seeking a global remedy for the more than 20,000 defendants whose convictions were tainted by Annie Dookhan's unprecedented[1] and far-reaching misconduct at the William A. Hinton State Laboratory Institute.  The court rejects a global remedy, adopting the view that "despite its considerable risks and burdens, case-by-case adjudication is the fairest and best alternative to resolve the cases potentially tainted by Dookhan's misconduct."  <u>Ante</u> at   .  I disagree.  Now, more than five years after Dookhan's misconduct first came to light, the need to adopt a swift and sure remedy for the harm caused by her deceit presents itself with palpable urgency.  The time has come to close the book on this scandal, once and for all, by adopting a global remedy.  While I agree, as the court notes, that a global remedy is "strong medicine," <u>ante</u> at   , the continuing violation of the rights of the defendants affected by Dookhan's misconduct and the damage to the integrity of our criminal justice system demand no less.

Contrary to the court's assessment of the case-by-case procedure offered as the solution to the problem the court is obliged to solve, it is neither the fairest nor the best

---

[1] An exhaustive search of reported cases yielded not a single case involving misconduct comparable to that committed by Dookhan.

alternative for remedying the manifest injustice to the defendants caught up in the Dookhan scandal and for restoring the integrity to our criminal justice system. It fails as the "fairest" alternative because it flouts the guiding principle that "in the wake of government misconduct that has cast a shadow over the entire criminal justice system, it is most appropriate that the benefit of the remedy inure to the defendants." Commonwealth v. Scott, 467 Mass. 336, 352 (2014), citing Lavallee v. Justices in the Hampden Superior Court, 442 Mass. 228, 246 (2004). It also fails as the "best" alternative because it is simply unworkable as a timely and effective mechanism for addressing the due process claims of the thousands of defendants now deemed to have been convicted on Dookhan's tainted evidence. In short, the court's solution is too little and too late. The only fitting end to this blight on the integrity of our criminal justice system is vacatur and dismissal with prejudice of the convictions of all relevant Dookhan defendants. Therefore, I dissent.

The case for a global remedy. We have been here before. We acknowledged in Scott, 467 Mass. at 352, that Dookhan's misconduct caused "a lapse of systemic magnitude in the criminal justice system." Recognizing the "particularly insidious" nature of Dookhan's misconduct and that it "belies reconstruction," we adopted a conclusive presumption of

egregious government misconduct as an accommodation to those defendants able to establish Dookhan's role in producing the evidence upon which their conviction was based.  Id.  Later in Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465 (2015) (Bridgeman I), we declined the invitation to implement a global remedy for the thousands of cases affected by Dookhan's misconduct "at this time."  Id. at 487.  Signaling a preference for a measured approach rather than the more drastic global remedy advocated by the petitioners, we noted that "our decisions in Scott and [Commonwealth v. Charles, 466 Mass. 63 (2013)], have provided Dookhan defendants . . . with meaningful solutions for addressing concerns that have arisen as these defendants attempt to challenge their drug convictions."  Id.

Since Bridgeman I, however, Scott's promise as a hedge against the wholesale violation of the due process rights of this class of defendants has been undermined by the sheer magnitude of the problem.  Scott was decided without the benefit of the investigative reports establishing the scope of Dookhan's misconduct.[2]  The court reasonably assumed, therefore, that the jurisprudential shortcut to proving Dookhan's misconduct would make a case-by-case approach workable.  Because we now know the extent of Dookhan's misconduct and that it has not yet been mitigated in any significant respect by the measures in Scott

---

[2] See ante at note 6.

and <u>Charles</u>, that assumption is no longer valid. With a clearer eye on the scope of the problem, <u>Scott</u>'s characterization of Dookhan's misconduct as a "lapse of systemic magnitude" still stands as an apt factual and legal context for the petitioners' claims. <u>Scott</u>, 467 Mass. at 352.

In this case, as in <u>Scott</u>, we are called upon to "exercise our superintendence power [under G. L. c. 211, § 3,] to fashion a workable approach to motions to withdraw a guilty plea brought by defendants affected by [Dookhan's] misconduct." <u>Id</u>. In this undertaking, the appropriate analytical framework is that articulated in <u>Scott</u>.[3] We noted that in fashioning a remedy for the "systemic lapse" caused by Dookhan's misconduct, "[w]e must account for the due process rights of defendants, the integrity of the criminal justice system, the efficient administration of justice in responding to such potentially broad-ranging misconduct, and the myriad public interests at stake." <u>Id</u>. In

---

[3] Without clearly explaining why, the court strays from the analytical framework we adopted in <u>Scott</u>, relying instead on a self-selected set of "principles" explained in elaborate detail. <u>Ante</u> at    . I agree that these principles are firmly rooted in our jurisprudence, but they are not necessarily dispositive of the issue presented here. Absent a reason to play by a different set of rules from that articulated in <u>Scott</u>, 467 Mass. at 352, and reiterated in <u>Bridgeman I</u>, 471 Mass. at 487, as an appropriate standard to apply in "fashion[ing] a workable approach" to handling the cases in which Dookhan was the primary or confirmatory chemist, I would not spurn the analytical approach adopted in <u>Scott</u>. The problem here is the same as it was in <u>Scott</u>: the need to craft a fair and timely approach to the resolution of these cases.

balancing these factors as discussed below, I am persuaded that the case for a global remedy as advocated by the petitioners is compelling.

1. Due process rights. The due process rights at stake here, "the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (citation omitted), Bridgeman I, 471 Mass. at 479, weigh heavily in Scott's remedial calculus for two reasons:  the serious and ongoing collateral consequences to the class of defendants convicted on the strength of Dookhan's tainted evidence; and the necessity to avoid unnecessary delay beyond the four years that already have elapsed in providing these defendants a "meaningful" opportunity to establish prejudice from Dookhan's misconduct.  The court, ante at, paints a grim picture of how lives are upended by the serious collateral consequences of drug-related convictions.  The picture is even more grim when one considers that many, if not most, of these defendants have already served their sentences.[4] They have paid their debt to society whether they owed one or not.  The years spent incarcerated cannot be restored to these

---

[4] An analysis conducted by a data science fellow at the American Civil Liberties Union Foundation of Massachusetts found that approximately sixty-two per cent of the convictions in the cases tainted by Dookhan's misconduct were for possession only and that about ninety-one per cent of these cases were resolved in the District Court. These statistics support the assumption that most defendants have completed their sentences.

defendants, but a fair and just resolution can make amends. What due process requires then is a remedy that is simple, sure, and final. That means a remedy that is uncomplicated by the myriad moving parts built into the court's case-by-case model, free of the risk that further delay will prolong the only relief that realistically can be offered to defendants who have already served their sentences. This interpretation of what due process requires at this point in the effort to solve the Dookhan problem is supported by Scott and Bridgeman I.

In Bridgeman I, 471 Mass. at 479, the court declined to adopt a global remedy in part based on the "substantial efforts that are being made to deal with the impact of Dookhan's misconduct." With at least the prospect of a speedy resolution of the cases in which Dookhan was the primary or confirmatory chemist, the court was content to delay a more robust remedy to allow those efforts to accomplish their purpose.[5] Id. at 487. Here, however, we have come to an end point in assessing the impact of Scott and Charles in resolving the outstanding cases of this type. The district attorneys have identified 24,000 cases, more or less, that must be adjudicated on the prejudice prong of Scott. Thus, the scope of the current challenge is

---

[5] The court observed that "[o]ur decision . . . will go a long way in resolving additional concerns that have surfaced and in moving these cases forward towards resolution." Bridgeman I, 471 Mass. at 487.

clear. The remedy, in accounting for defendants' due process right to a prompt hearing, must have some reasonable prospect for immediate resolution of the 24,000 cases to avoid exacerbating the serious consequences of delay. I am not persuaded that the court's case-by-case model meets this test in circumstances where the defendants' due process rights are paramount.

2. Integrity of the criminal justice system. It is beyond dispute that Dookhan's misconduct, the details of which have spread beyond the legal community,[6] has undermined public trust in the integrity of the criminal justice system. In a case such as this, coming before the court as a consequence of Dookhan's serious corruption of our criminal justice system, the court's task is not merely to decide the rights of the parties. The court must also act, within the boundaries of the law, to restore the public's faith in the integrity of the courts. Unlike the right to counsel crisis in Lavallee, Dookhan's misconduct is not a problem of the Legislature's making. See Lavallee, 442 Mass. at 246. The duty to protect, and restore when necessary, the integrity of the criminal justice system falls squarely upon the court.

With no clear sign from the court that it grasps the scope

---

[6] See, e.g., Jackman, When a State's Drug Chemist Lies for Years, Should All Her Cases Be Thrown Out?, Wash. Post, Sept. 29, 2016.

of the damage and the need for an approach that will eliminate "root and branch"[7] all of the attendant consequences, the public is left to wonder if the process by which a court imposes the sanction of a loss of liberty is fair and just.[8] Restoring the integrity of the criminal justice system requires that the court acknowledge and make amends for the shortcomings in a system that permitted Dookhan to "go rogue" for so long without detection.[9] Those shortcomings call into question the integrity of the entire criminal justice apparatus for gathering and reporting the evidence that juries rely on in deciding a defendant's guilt or innocence. The perceived legitimacy of court-imposed restraints on a defendant's liberty rises or falls on the integrity of the evidence. If the mistrust engendered by the individual and institutional failures that produced this scandal is allowed to remain, it will have far-reaching adverse

---

[7] See Green v. County Sch. Bd., 391 U.S. 430, 437-438 (1968)(using phrase to describe obligation to dismantle school segregation fourteen years after command to do so in Brown v. Board of Educ., 347 U.S. 483 [1954]).

[8] Over the years, the racial impact of our sentencing practices have come under scrutiny. See e.g., The Sentencing Project, The Color of Justice: Racial and Ethnic Disparity in State Prisons, at 3, 5, 7-8 & n.13, 16-18 (2016). Although racial bias has not been documented, members of the public, especially those in the communities of color, rarely parse such reports in search of the real reason for disparate impact.

[9] "Dookhan's consistently high testing volumes should have been a clear indication that a more thorough analysis and review of her work was needed." See Scott, 467 Mass. at 340.

consequences for the ability of our courts to maintain the public's faith in the promise of equal justice for all.  Because I am not persuaded that the case-by-case model adopted by the court can accomplish this essential purpose, this factor weighs in favor of the global remedy advocated by the petitioners.

3.  Efficient administration of justice.  There is no question that, despite the best efforts of the parties, thousands of defendants affected by Dookhan's misconduct still languish without notice of their rights or even a realistic opportunity for redress.  The four-year delay in the resolution of the cases tainted by Dookhan's misconduct, as discussed above, adequately makes the point that the administration of justice has been anything but efficient.  Yet, the court gives insufficient weight to this factor in adopting a case-by-case adjudication model.

The efficacy of the court's case-by-case model is at best questionable, both because it is unworkable and because it is likely to perpetuate further delay in providing a remedy to the thousands of defendants affected by Dookhan's misconduct.  Not only is it lacking in the ability to insure a speedy resolution of the 24,000 cases thus tainted, it is vulnerable to failure for several practical reasons:  the reliance on voluntary cooperation of the district attorneys, and unrealistic timetables.

First, the success of phase one, which anticipates a substantial culling of the 24,000 cases, depends entirely on the voluntary cooperation of the district attorneys. Ante at . Understandably, the court has not asserted any authority to compel the dismissal of cases. See Commonwealth v. Pellegrini, 414 Mass. 402, 405 (1993) ("Prosecutors have broad discretion in determining whether to prosecute a case"). In this respect, the court's model does not change the status quo: the district attorneys already have, and have had for the duration of the Dookhan crisis, the sole authority voluntarily to dismiss these cases. It is undisputed that the district attorneys have cooperated in identifying the defendants presumed to have been affected by Dookhan's misconduct. However, without some basis for a reasonable belief that the district attorneys will follow through on the suggestion to dismiss thousands of cases with prejudice, the court does not inspire confidence in the success of the model.

Second, the timetable for the accomplishment of the various phases of the case-by-case model is unrealistic and unachievable. The court acknowledges that "substantial vetting" is required under phase one. Ante at . Yet, the district attorneys are given only ninety days to sift through the 24,000 cases that have been connected to Dookhan's misconduct. If past is prologue, and taking into account the delays in getting to

where we are now, accomplishing this task within the ninety-day window adopted for the court's model is highly unlikely. Likewise, the thirty-day deadline in phase two for notice to the defendants whose cases will not be dismissed without prejudice is problematic for the same reason. To the extent that the time frames reflect a calculation that absolute compliance by the district attorneys and the Committee for Public Counsel Services will adequately accommodate the defendants' due process rights, I have no confidence that the court's faith in the practicality of the process will be rewarded. Unless the court is prepared to declare that reasonable requests for delay, even those based on the impracticality of the timetable, will be denied, the more likely scenario is that further indeterminable delay will occur.

With the defendants' due process right to a prompt hearing hanging in the balance, I cannot accept an untimely, and ultimately unworkable, case-by-case model as an appropriate resolution of the issue before us.

4. Other public interests. None of the other public interests at stake here warrants a disposition that prolongs a global remedy for the defendants who are presumed to have been victims of Dookhan's misconduct. First, the likelihood that the vast majority of the defendants in the cases in which Dookhan was the primary or confirmatory chemist have completed their sentences mitigates the most compelling public interest at stake

here:  public safety.  On the other side of the ledger, the serious and enduring collateral consequences of these convictions remain extant, resulting in manifest injustice to those defendants.  The court weighs the rights of the defendants "against the necessity for preserving society's interest in the administration of justice" and concludes that this factor favors the Commonwealth.  Ante at    , quoting Commonwealth v. Cronk, 396 Mass. 194, 198-199 (1985).  In my view, this calculation is demonstrably erroneous.  Society's interest in the administration of justice is hardly served by a remedy that defers to the Commonwealth in deciding which, if any, cases are to be dismissed with prejudice and, in all other respects, depends on the defendants to opt into the scheme to benefit from the possibility that the case will be dismissed with prejudice. Ante at.

In sum, the Scott factors weigh heavily in favor of the defendants in the cases tainted by Dookhan's misconduct.  The scope and egregiousness of that misconduct, combined with the four-year delay in providing relief to the defendants affected by it, compels a global remedy.  It is difficult to imagine a scenario where, faced with the detritus from a scandal of similar magnitude, a court would hesitate to order a global

remedy.  The question comes to mind, "If not now, when?"[10]

---

[10] C. Taylor, Sayings of the Jewish Fathers 7 (2d ed. 1897) (quoting Hillel the Elder).