NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13301

COMMONWEALTH  vs.  LINDSEY A. HALLINAN.


Essex.      December 7, 2022. - April 26, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Motor Vehicle, Operating under the influence.  Supreme Judicial
      Court, Superintendence of inferior courts.  Practice,
      Criminal, Admission to sufficient facts to warrant finding,
      Sentence.  Evidence, Breathalyzer test, Scientific test.
      Constitutional Law, Conduct of government agents.



Complaint received and sworn to in the Salem Division of
the District Court Department on October 9, 2013.

A motion to withdraw an admission to sufficient facts,
filed on July 6, 2021, was heard by Robert A. Brennan, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Murat Erkan (Joseph D. Bernard also present) for the
defendant.
David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.
Ira L. Gant, Nathan Tamulis, Patricia Muse, & Ben
Leatherman, Committee for Public Counsel Services, & Joshua M.
Daniels, for Committee for Public Counsel Services & another,
amici curiae, submitted a brief.

Amy Spector, Assistant Attorney General, for Registry of Motor Vehicles, amicus curiae, submitted a brief.

GAZIANO, J. In this case we are asked to exercise our extraordinary superintendence powers under G. L. c. 211, § 3, in light of government misconduct involving the State police office of alcohol testing (OAT) and its use of the Draeger Alcotest 9510 breathalyzer device. In November 2013, the defendant, Lindsay A. Hallinan, admitted to facts sufficient to support a finding of guilty to operating a motor vehicle while under the influence of intoxicating liquor (OUI), second offense, after her attorney advised that her case was unwinnable due to an Alcotest 9510 breath test result showing a blood alcohol content (BAC) of 0.23 percent. The matter was continued without a finding for two years, the defendant was placed on probation with conditions for alcohol treatment and random testing, and her driver's license was suspended for two years. The defendant subsequently moved to withdraw her admission to sufficient facts. The motion was denied because she was unable to show a nexus between the allegations of governmental misconduct involving the Alcotest 9510 device and her own case; she was not a member of the consolidated class of defendants who were challenging the reliability of the Alcotest 9510 device, nor did she request discovery in her own case. The defendant

appealed, and we granted her application for direct appellate review.

The extensive nature of OAT's misconduct, and the inability of the defendants in the consolidated cases challenging the reliability of the Alcotest 9510 device, see Commonwealth vs. Ananias, Dist. Ct., No. 1248CR1075 (Ananias litigation), to receive a fair Daubert-Lanigan hearing, see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994), have resulted in the violation of the right to due process for approximately 27,000 defendants. Accordingly, defendants who pleaded guilty or who were convicted after trial, and the evidence against whom included breath test results from the Alcotest 9510 device from June 1, 2011, through April 18, 2019, are entitled to a conclusive presumption of egregious government misconduct.  They may proceed in motions to withdraw their guilty pleas, and motions for new trials, without having to establish egregious government misconduct in each case, see Commonwealth v. Scott, 467 Mass. 336, 346 (2014); Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006), and their breath test results are excluded from use at any subsequent trial.

Accordingly, in this case, the judge erred in denying the defendant's motion to withdraw her admission to sufficient facts,[1] and her motion should have been allowed.[2]

1. Background. On the evening of October 5, 2013, police were operating a sobriety checkpoint on Route 1A in Beverly. State police Trooper Thomas Canning, who was greeting drivers at the checkpoint, observed that "[the defendant's] eyes were red and glassy, he could smell the odor of an intoxicating liquor coming from the vehicle, and her speech was slurred." Canning directed the defendant to a parking lot for further evaluation by State police Trooper Carolyn Mansi. Mansi observed that the defendant "seemed dazed," did not appear to notice the trooper, and admitted to consuming three drinks at a local sports bar. At Mansi's request, the defendant performed a series of field sobriety tests; she was unable to complete any of them successfully. The defendant then consented to a breath test, which was administered using a Draeger Alcotest 9510

---

[1] Because an admission to sufficient facts to warrant a finding of guilty "exposes a defendant to some of the same collateral consequences as a guilty plea, we treat the admission the same as a guilty plea" for purposes of this discussion, and in this opinion we refer to the two interchangeably. See Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 319 n.18 (2016).

[2] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers and the amicus letter submitted by the Registry of Motor Vehicles.

breathalyzer. The result of the test was a 0.23 percent BAC, well above the legal limit of .08 percent. See G. L. c. 90, § 24 (1) (a) (1).

In November 2013, the defendant admitted to sufficient facts on a single count of OUI, second offense.[3] The judge ordered that the matter be continued without a finding for two years, on conditions that the defendant enroll in the fourteen-day second offender program, abstain from alcohol for six months, submit to an evaluation pursuant to G. L. c. 90, § 24Q, attend Alcoholics Anonymous (AA) meetings at least once a week, and submit to random alcohol testing. The judge also imposed a two-year loss of her driver's license. See G. L. c. 90, § 24 (1) (c) (2).

The defendant subsequently moved to withdraw her plea on the ground that her admission to sufficient facts was not knowing and voluntary, because of issues with the Alcotest 9510 device and the government misconduct that came to light in the Ananias litigation. See Commonwealth vs. Ananias, Dist. Ct., No. 1248CR1075 (Feb. 16, 2017) (Ananias I); Commonwealth vs. Ananias, Dist. Ct. No. 1248CR1075 (Jan. 9, 2019) (Ananias II). In support of her motion, the defendant submitted an affidavit averring that her decision to resolve the case largely was due

---

[3] The defendant had been convicted of OUI in New York in 2006.

to her attorney's advice, based on his assessment that the breath test results made the case unwinnable. After a nonevidentiary hearing, the same judge who presided over the Ananias litigation denied the defendant's motion. The defendant appealed to the Appeals Court, and we thereafter allowed her petition for direct appellate review.

2. Discussion. Before us, the defendant seeks to withdraw her guilty plea as a result of newly discovered evidence -- the findings after multiple evidentiary hearings in the Ananias litigation -- concerning State police management and handling of the Alcotest 9510 device that was used to test her blood alcohol level after the stop; this new evidence suggests egregious misconduct by OAT. In light of this newly discovered evidence, the defendant argues that her admission to sufficient facts was induced involuntarily by OAT's misconduct. See G. L. c. 90, § 24 (1) (a) (1).

Before turning to the defendant's arguments, some background understanding of OAT's purpose, structure, and organization is necessary.[4]

---

[4] The facts concerning the structure and operation of OAT, set forth in the judge's decision on the defendant's motion to withdraw, are based on his findings in two memoranda of decision in the Ananias litigation as well as the joint stipulations of facts in that case, and the proceedings at the hearing on the defendant's motion to withdraw. After remand by this court in Commonwealth v. Camblin, 471 Mass. 639, 640 (2015), for

a.  Structure and regulation of OAT.  The State police crime laboratory (crime lab) is a forensic sciences organization that provides scientific analysis and testimony in support of police departments and prosecutors' offices across the Commonwealth.  OAT, which oversees the breath testing program for the Commonwealth, is a unit within the crime lab.  At the time of the events underlying this litigation, OAT had one supervising scientist, Melissa O'Meara, who supervised three other scientists.

To convict a defendant of OUI, the Commonwealth must prove that (1) the defendant operated a motor vehicle, (2) on a public way or place to which the public had a right of access, and (3) while under the influence of alcohol.  See Commonwealth v. Zeininger, 459 Mass. 775, 778, cert. denied, 565 U.S. 967 (2011); Commonwealth v. O'Connor, 420 Mass. 630, 631 (1995); G. L. c. 90, § 24 (1) (a) (1).  To establish OUI, the Commonwealth may proceed on a theory of impairment (impaired ability to operate) or on a theory of a per se violation (operating with a BAC of 0.08 percent or greater).  See Commonwealth v. Hebb, 477 Mass. 409, 412 (2017); Zeininger,

_____

evidentiary hearings and fact finding, this judge was appointed to preside over the consolidated Ananias litigation.  The judge's findings in the Ananias litigation, following extensive evidentiary hearings involving approximately 600 defendants, are set forth in full in Ananias I and Ananias II.

supra; Commonwealth v. Rumery, 78 Mass. App. Ct. 685, 686 (2011).

OAT scientists assist prosecutors when they are proceeding against defendants on the theory of a per se violation. The scientists provide a report setting forth the results of a chemical test of an individual's BAC; although this measurement can be obtained through a breathalyzer test or through a blood test, see G. L. c. 90, § 24 (1) (e), in practice, the breathalyzer test is the most commonly used one. General Laws c. 90, § 24K, provides that, for a breath test to be considered valid, it must have been performed by a "certified operator," using a certified "infrared breath-testing device." The statute also mandates that the Secretary of Public Safety (secretary) "promulgate rules and regulations regarding satisfactory methods, techniques and criteria for the conduct of such tests, and shall establish a Statewide training and certification program for all operators of such devices and a periodic certification for such breath testing devices." See G. L. c. 90, § 24K.

In accordance with this mandate, the Executive Office of Public Safety and Security (EOPSS) has promulgated regulations directing that OAT perform annual certifications of all breath testing instruments used in the Commonwealth. See 501 Code Mass. Regs. § 2.06 (2016). These regulations also provide that

OAT is responsible for establishing and maintaining a list of approved breath test devices; certifying the functionality of all breath testing equipment used in the Commonwealth on an annual basis; approving and distributing all calibration standards used with breath test instruments; establishing standards for training and certification for breath testing; and creating and maintaining a breath test operator's manual.  See 501 Code Mass. Regs. §§ 2.04-2.05 (2016).

In accordance with these regulations, OAT creates and maintains records of the authorization and testing process used in readying breath test instruments for use in the Commonwealth. OAT first formally adopted a written certification protocol for testing and calibrating its instruments in September 2014, under the direction of O'Meara.[5]  Before the establishment of this protocol, OAT had had no formal, written policies to standardize testing and calibration procedures to be followed by its scientists.  Instead, in performing specific tasks related to the proper functioning and certification of the breath test instruments, OAT scientists had employed a variety of "certification worksheets" with checkboxes.  These worksheets

---

[5] Melissa O'Meara became the supervising scientist at OAT in June 2011.  In that role, she was responsible for the day-to-day operation of the State police crime laboratory (crime lab), as well as for establishing policies and procedures for breath test administration and training in accordance with the promulgated regulations.

consisted of a list of steps to be completed and acknowledged to certify that an instrument was functioning properly.

Before September 2014, if an instrument did not perform adequately on the first certification attempt, it was OAT's practice to set aside the instrument, place the partially completed worksheet[6] in the instrument's assigned folder, and conduct a second attempt at certification after a period of rest. If the second attempt also failed, the instrument would be sent to the manufacturer for repairs. Eventually, this process also was guided by the State police quality assurance manual, which contained procedures, instructions, and requirements for calibration and certification of all crime lab equipment, including the Alcotest 9510 breathalyzer.

OAT maintained records detailing when machines had to be sent to the manufacturer for repair, so that it could keep track of when the repaired machine was returned; occasionally, a description of the work that had been completed by the manufacturer was indicated. Thus, two types of repair records -- internal documentation by OAT and the manufacturer's documentation delineating the repairs -- were stored at OAT. In 2011, when the Alcotest 9510 device was introduced for use in the Commonwealth, OAT generated authorization reports, which

---

[6] These incomplete worksheets were known as "failed worksheets."

indicated that the particular instrument was authorized for use. Those reports generally were maintained in the folder for the corresponding instrument.

b. <u>OAT's discovery practices</u>. At all times relevant here, OAT frequently received discovery requests from both prosecutors and defense attorneys.[7] Prosecutors seeking test results for use at trial obtained records from OAT by filling out a request form. This form, created by OAT, contained four check boxes to indicate the information the prosecutor was seeking; there was no area for the individual to request additional types of documents.[8]

It was OAT's practice to supply only documents specifically requested on this form. If a prosecutor requested documents

---

[7] The crime lab maintains a written policy, first promulgated on July 24, 2015, regarding discovery requests. At all times relevant here, the policy indicated that all requests, whether through court orders, public records requests, or from prosecutors' offices, were to be received, reviewed, and fulfilled by the crime lab's case management unit (CMU). The CMU employed five full-time staff members who provided comprehensive records relating to firearms, deoxyribonucleic acid, trace evidence, and other laboratory functions. The one exception to the policy was that OAT handled its own discovery responses, without any assistance from the CMU.

[8] The possible categories of documents that could be requested were the "90-24 Record" (breath test data for defendant); "Periodic Test Record" (test data from standard calibration tests initiated prior to defendant's breath test); "Calibration and Verification Records" (OAT testing data); and "Certification Summary" (containing OAT certification, expiration date, and certifying chemist).

that fell outside one of the categories indicated on the form, OAT would require the prosecutor to obtain a court order before responsive documents were produced.  Efforts to respond to these more complex requests were coordinated by O'Meara.  It was not OAT's practice to request input from the crime lab's legal counsel when responding to discovery requests.

Once OAT collected what it deemed to be responsive documents, it would mail the package to the appropriate court clerk.  The documents sent typically included records relating to the certification and periodic testing of a particular breathalyzer machine, along with a supporting affidavit by the keeper of records.  This affidavit obviated the need for OAT personnel to appear to testify in OUI trials; instead, the records and affidavits were introduced at trial without scientific testimony.[9]  See Zeininger, 459 Mass. at 786 ("OAT certification records are outside the orbit of the 'common nucleus' of the various definitions of 'testimonial' set forth in Crawford[ v. Washington, 541 U.S. 36,] 51-52 [2004]").

_____

[9] OAT employees, however, routinely appeared as witnesses in specific, more complex cases involving issues of blood serum analysis and retrograde extrapolation (a mathematical calculation used to estimate a person's BAC at a particular point in time by working backward from the time the BAC was tested and factoring in rates of absorption and excretion).  See, e.g., Commonwealth v. Colturi, 448 Mass. 809, 811 (2007); Commonwealth v. Douglas, 75 Mass. App. Ct. 643, 646 (2009).  These cases are rare and represent only a small fraction of prosecutions involving breath testing.

c.   Prior litigation on admissibility of breath test results.  The defendant's challenge here is based on extensive proceedings in earlier litigation in other, related cases, including the Ananias litigation.  To evaluate her arguments, familiarity with some of those proceedings is necessary.

Until June 2015, breath test results had been admissible by statute, and in practice were admitted without question, in the prosecution of OUI cases.  See Zeininger, 459 Mass. at 786-787.  General Laws c. 90, § 24 (1) (e), provides that, in any OUI prosecution,

> "evidence of the percentage, by weight, of alcohol in the defendant's blood at the time of the alleged offense, as shown by . . . a chemical test or analysis of his breath, shall be admissible and deemed relevant to the determination of the question of whether such defendant was at such time under the influence of intoxicating liquor."

In 2013, a group of defendants involved in then-pending OUI prosecutions sought to exclude breath test evidence derived from a different breathalyzer, the Alcotest 7110 MK III-C, made by the same manufacturer as the Alcotest 9510 device, on the ground that the source code used in the device's computer programs, in conjunction with other deficiencies, rendered its results unreliable.  See Commonwealth v. Camblin, 471 Mass. 639, 640 (2015).  We concluded that the defendants were entitled to seek a Daubert-Lanigan hearing to challenge the reliability of the newest breathalyzer technology, because "breath test evidence,

at its core, is scientific evidence," id., and "where 'evidence produced by a scientific theory or process' is at issue, the judge plays an important gatekeeper role to evaluate and decide on its reliability as a threshold matter of admissibility." Id. at 648, citing Lanigan, 419 Mass. at 25-26.

i. First Ananias decision. After the Camblin matter was remanded to the District Court for such a hearing, the Chief Justice of that court issued an order of special assignment consolidating 535 cases in which defendants who had been charged with OUI similarly had challenged the scientific reliability of the Alcotest 9510,[10] the device that had been in use throughout the Commonwealth at that time. In November 2015, the Chief Justice of the Boston Municipal Court likewise consolidated sixty-four cases raising the same issue. Thousands of other OUI cases were stayed pending the outcome of that consolidated litigation. The parties then sought review in the county court to challenge the orders of consolidation and a number of rulings on discovery issues.

In June 2016, a single justice ordered that both sets of consolidated cases be consolidated. The Chief Justice of the

---

[10] As stated, the Camblin defendants challenged the technology used in the Alcotest 7110 MK III-C breathalyzer. See Camblin, 471 Mass. at 640. In Ananias I, the court expanded the scope of the reliability challenge permitted in Camblin to include the newest device, the Alcotest 9510, which began replacing the Alcotest 7110 in June 2011. See Ananias I, supra.

Trial Court then assigned the consolidated case to a specific District Court judge pursuant to G. L. c. 211B, § 9. In preparation for Daubert-Lanigan hearings in their individual cases, many of the defendants had filed discovery motions. In response, multiple judges had ordered OAT to produce documentation. The newly assigned judge issued a comprehensive discovery order requiring the Commonwealth to produce, among other items, "[d]ocumentation of the [instrument] certification process, which provides instructions to the OAT employee performing the certification," as well as all certification worksheets for Alcotest 9510 devices since 2011.

The crime lab's attorney conveyed the substance of the court's order to O'Meara, who coordinated the production of responsive documents. The attorney did not participate in the actual review, collection, or production of the documents. Ultimately, OAT produced a digital versatile disc (DVD) containing more than 2,000 certification worksheets and a few failed, incomplete worksheets. The crime lab attorney submitted the DVD to the court and represented that it contained "all of the worksheets for certification[,] as the [court] ordered all be turned over." Unbeknownst to the prosecutors and defense attorneys, at that time, OAT had not produced all of the certification worksheets that had been ordered.

A Daubert-Lanigan hearing commenced on January 18, 2017.
Over ten days, the judge heard expert testimony concerning the
reliability of the Alcotest 9510 device.  On February 16, 2017,
in Ananias I, the judge denied in part, and allowed in part, the
defendants' motions to exclude their breath test results.  The
judge found that, despite its ability to produce scientifically
reliable results, the annual certification methodology used by
OAT to certify the Alcotest 9510 device, from its initial
deployment in June 2011, through September 2014, "did not
produce scientifically reliable BAC results," because of the
absence of written protocols to be used in calibrating and
certifying the operation of the device.  More specifically, the
judge found that the procedures used in preparing the devices
for deployment in the field were shared only informally through
"word of mouth around the lab."  Consequently, the judge
concluded, OAT's methodology produced presumptively unreliable
breath test results from June 2011,[11] through September 15, 2014.

Notwithstanding this finding, the Commonwealth was
permitted to demonstrate, on a case-by-case basis, that a

---

[11] Ananias I originally stated that the Alcotest 9510 device
was first used in June 2012, and therefore, the presumption for
tests began in June 2012.  A subsequent order was issued to
correct the findings of fact to reflect that the Alcotest 9510
device was in use beginning in June 2011.  The parties have
agreed that, consistent with the court's reasoning, the
presumption applies to tests performed starting in June 2011.

particular Alcotest 9510 device had been calibrated and certified using scientifically reliable methodology and, thus, that a particular BAC result was scientifically reliable. Results obtained after the promulgation of written protocols by OAT on September 15, 2014, were determined to be presumptively reliable and admissible in criminal prosecutions. Accordingly, the defendants' motion to exclude results obtained using the Alcotest 9510 from devices that had been calibrated and certified after September 15, 2014, was denied, but the defendants' motion with respect to results produced by any Alcotest 9510 device that had been calibrated and certified between June 1, 2011, and September 14, 2014, was allowed.

ii. Second Ananias decision. Following Ananias I, District Court and Boston Municipal Court judges conducted numerous hearings on motions in limine where the Commonwealth sought to admit BAC results obtained using Alcotest 9510 devices that had been calibrated and certified between June 1, 2011, and September 14, 2014, despite the finding of presumptive unreliability. At these hearings, prosecutors began to call OAT scientists as witnesses in OUI cases that involved results from these machines. On August 2, 2017, during a hearing in the District Court on one such case, where an OAT employee had testified, the judge determined that OAT had failed to disclose exculpatory "failed certification" worksheets demonstrating that

the particular Alcotest 9510 device at issue had failed certain certification tests. Contemporaneously, the Ananias litigation defendants received a response to a Freedom of Information Act request; the response contained a significantly larger number of the same type of documents that were ordered to be produced in the Ananias litigation prior to the Ananias I decision, indicating that OAT had failed to produce hundreds of similar failed worksheets that were considered to be exculpatory.

On August 19, 2017, the Ananias litigation defendants filed a motion to compel and to impose sanctions. The Commonwealth responded that OAT personnel had not made the Commonwealth aware of these documents, despite prosecutors' best efforts to obtain all required discovery. On August 31, 2017, the secretary directed EOPSS, the administrative body that oversees OAT, to investigate OAT's discovery practices.

iii. EOPSS report. In an extensive report following a six-week investigation, EOPSS identified a history of intentional withholding of exculpatory evidence by OAT, blatant disregard of court orders, and other misconduct, all underscored by "a longstanding and insular institutional culture that was reflexively guarded." The discovery practices that led to the withholding of exculpatory evidence predated the Ananias litigation.

In one example, the EOPSS report described a case decided prior to the Ananias litigation, in which OAT failed to produce any of its internal repair records. A District Court judge allowed a discovery motion that requested "[a]ny and all maintenance records including but not limited to calibration, repairs and certification of the breath testing device concerning the test administered to the . . . [d]efendant." As stated, it was OAT policy to produce only the manufacturer's repair records, which included the invoice, the manufacturer's repair authorization form, and, occasionally, a description of the repair that had been completed. Relying on this policy, OAT did not produce its internally generated repair records, in violation of the discovery order.

In March 2013, in another case preceding the Ananias litigation, a District Court judge allowed a discovery motion that requested "[a]ll information, data and documents that contain information about testing and repair of the breath test device utilized by the . . . [p]olice [d]epartment to test the defendant." OAT did not produce the authorization report relating to the device that had been used, even though the record was present in the file for that device.

The EOPPS investigation found that the failure to disclose documents, specifically in the context of the Ananias litigation, arose from a lack of communication between OAT and

the assistant district attorneys who were assigned to the Ananias litigation. The prosecutors were unfamiliar with general OAT discovery policies and, in particular, were unaware that it was OAT policy not to produce failed worksheets when an instrument failed certification. Indeed, the EOPPS report highlighted that OAT scientists responding to discovery requests were instructed not to provide failed worksheets. If a scientist included such a worksheet in the discovery package, O'Meara would insist that the failed worksheet be removed, because she considered it to be nonresponsive.[12] These failures left prosecutors in the Ananias I litigation representing to the judge, and to defense counsel, that the Commonwealth had complied with its discovery obligations, when in fact it had not. Accordingly, the prosecutors were unable adequately to carry out their obligation to identify and produce exculpatory evidence.

As a result of the EOPSS investigation, in October 2017, the secretary directed the State police to undertake a number of

_____

[12] When O'Meara was interviewed in conjunction with the EOPSS investigation, she explained that she considered failed certification worksheets to be "data not reported" and, therefore, under OAT policy, not subject to discovery. She also commented that, in her view, because no motorist had been subjected to breath testing with an instrument that was put in the field without having been calibrated successfully, the failed calibration attempts had no probative value, and thus appropriately were excluded from consideration in the certification analysis.

remedial measures.  The State police were required to expand the responsibilities of the case management unit (CMU), which followed established protocols that specifically delineated how to respond to discovery requests, to include OAT.  The secretary also required OAT to eliminate its long-standing policy of requiring court orders before complying with "nonstandard" discovery requests and, instead, instructed OAT to comply with all discovery requests from prosecutors' offices.  OAT also was required to enhance and expand its then newly released electronic discovery (eDiscovery) portal, to obtain accreditation by the ANSI-ASQ[13] National Accreditation Board (ANAB) within twelve months, and to conduct enhanced training for OAT employees, focusing on the identification of, and their duties regarding, exculpatory information.

iv.  Joint stipulation.  Over the course of the next year, prosecutors turned over tens of thousands of documents that had not previously been provided to the consolidated defendants.  On August 14, 2018, following extensive negotiations, the parties submitted a joint stipulation and a recommended resolution to the defendants' motion for sanctions.  The stipulation included factual findings from the EOPSS report.

---

[13] American National Standards Institute – American Society for Quality.

Among other things, the parties stipulated that (1) in Ananias I, the judge had ordered OAT to produce copies of all of the annual certification and calibration worksheets used to conduct the annual calibration of the Alcotest 9510 devices; (2) OAT produced 1,976 worksheets and represented that these were all the worksheets the judge had ordered produced; (3) of the 1,976 worksheets, only eleven were incomplete worksheets indicating a failed calibration; (4) OAT intentionally withheld an additional 432 worksheets that reported failures in the annual calibration process; (5) OAT did not inform the prosecutors, the defense attorneys, or the judge that it was withholding the 432 worksheets; and (6) the withheld failed worksheets were exculpatory.

The parties also agreed on specific remedial measures. OAT committed to applying for national accreditation with ANAB and to expanding its existing eDiscovery portal to provide all users equal access to breathalyzer-related records and documents. In addition, the parties agreed that the period for which Alcotest 9510 test results were deemed to be presumptively excluded would be enlarged through a date to be set by the judge; the Commonwealth would not seek to establish the reliability of OAT's calibration and certification on a case-by-

case basis in cases pending trial;[14] and the Commonwealth would pay for notices to be sent to the approximately 27,000 defendants who had received an adverse disposition in a case in which the defendant submitted to an Alcotest 9510 test between June 1, 2011, and August 31, 2017. The joint stipulation of facts and the recommended resolution were submitted to the judge for approval.

After a three-day hearing, in January 2019, the judge accepted the joint stipulation of facts and the recommended resolution, made additional findings of fact, and issued a decision on the date that the presumptive exclusion of Alcotest 9510 test results would terminate. Ananias II, supra. The judge found that OAT's misconduct resulted in a deprivation of the consolidated defendants' due process rights because they had been unable to obtain a full, fair, and complete Daubert-Lanigan hearing. The judge concluded that EOPSS's findings regarding OAT's approach to producing exculpatory information had had a devastating impact on public trust and confidence in the fairness of the criminal justice system and the integrity of the process.

---

[14] The parties agreed that the Commonwealth could seek to do so on a case-by-case basis for cases involving motor vehicle homicide by OUI, G. L. c. 90, § 24G; OUI causing serious bodily injury, G. L. c. 90, § 24L; manslaughter by motor vehicle, G. L. c. 265, § 13 1/2; and OUI as a fifth or greater offense, G. L. c. 90, § 24 (1) (a) (1).

As a result of OAT's misconduct, the judge fashioned a remedy to restore confidence that OAT's methodology produces scientifically reliable breathalyzer results, and that OAT is fully disclosing those instances where, for a variety of reasons, it is unable to certify the reliability of a breathalyzer result. The judge ordered that the period of presumptive exclusion of Alcotest 9510 test results be extended until the Commonwealth could demonstrate compliance with seven remedial measures.

The remedial measures required the Commonwealth to show that OAT not only had filed an application for accreditation with ANAB, but also that the application was substantially likely to succeed. In addition, the application and the ANAB accreditation requirements manual had to be uploaded to the eDiscovery portal so that it publicly was accessible. The Commonwealth also had to demonstrate that OAT had promulgated discovery protocols consistent with those employed by the CMU, including policies defining exculpatory evidence and an explanation of OAT's obligations with respect to such evidence; in the alternative, the Commonwealth had to show that the CMU would be responsible for processing OAT's discovery requests. OAT's discovery protocol had to be made accessible publicly on the eDiscovery portal. Further, the Commonwealth had to show that all OAT employees had received training on the meaning of

exculpatory information and their attendant obligations, and all written materials used in this training had to be placed on the eDiscovery portal.

In July 2019, the judge issued a final order finding that, by April 18, 2019, the Commonwealth had satisfied all these remedial measures. Consequently, the period of presumptive exclusion of the results of breath tests extended from June 1, 2011, through April 18, 2019.

With OAT's history of misconduct in mind, we turn to the defendant's claims in this case.

d. <u>Motion to withdraw</u>. The defendant maintains that the judge erred in denying her motion to withdraw her admission to sufficient facts on the ground that her admission was not knowing and voluntary because of the later-discovered issues with the Alcotest 9510 device and the government misconduct that came to light during the Ananias litigation. In particular, she points to statements in her affidavit averring that her decision to accept the plea arrangement was based largely on her attorney's assessment that the breath test results made her case unwinnable. She maintains that her motion should have been allowed because OAT's misconduct was egregious and induced her admission to sufficient facts. Accordingly, her plea was not knowing and intelligent, and violated her right to due process.

"Due process requires that a guilty plea be accepted only where 'the contemporaneous record contains an affirmative showing that the defendant's plea was intelligently and voluntarily made.'"  Scott, 467 Mass. at 345, quoting Commonwealth v. Furr, 454 Mass. 101, 106 (2009).  "A guilty plea is voluntary so long as it is tendered free from coercion, duress, or improper inducements."  Commonwealth v. Wentworth, 482 Mass. 664, 679 (2019), citing Scott, supra.

i.  Standard of review.  A motion for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), "is the appropriate vehicle to attack the validity of a guilty plea or an admission to sufficient facts" (citation omitted).  Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 316 (2017) (Bridgeman II).  A judge may grant a motion for a new trial any time it appears that justice may not have been done.  See Commonwealth v. Moore, 408 Mass. 117, 125 (1990).  We review the denial of a motion for a new trial for abuse of discretion or significant error of law.  See Commonwealth v. Sherman, 451 Mass. 332, 334 (2008), quoting Commonwealth v. Martin, 427 Mass. 816, 817 (1998).

ii.  Voluntariness of admission to sufficient facts.  In Scott, 467 Mass. at 346, in light of the so-called drug lab scandals, we adopted a two-pronged test to determine when government misconduct is so egregious that it renders a guilty

plea involuntary, and thus in violation of a defendant's rights to due process.  See Ferrara, 456 F.3d at 290.  To prevail on a claim that government misconduct induced a defendant to admit to sufficient facts, "the defendant must show both that 'egregiously impermissible conduct . . . by government agents . . . antedated the entry of his [or her] plea' and that 'the misconduct influenced his [or her] decision to plead guilty or, put another way, that it was material to that choice.'" Scott, supra, quoting Ferrara, supra.  Establishing egregious government misconduct, in turn, requires the defendant to show that (1) the egregious government misconduct preceded the entry of his or her guilty plea; (2) the egregious misconduct was undertaken by government agents; and (3) the misconduct occurred in the defendant's case.  See Scott, supra at 347-351.

The defendant contends that OAT's failure to establish written calibration protocols for the Alcotest 9510 breathalyzer, and OAT's intentional withholding of exculpatory evidence beginning at least as early as the deployment of the Alcotest 9510 device in June 2011, are sufficient to demonstrate egregious government misconduct by OAT in her case.

A.  Egregiously impermissible conduct.  Our decisions addressing the misconduct in State police drug laboratories involving State police chemists Annie Dookhan and Sonja Farak contain extensive discussion of what constitutes egregious

government misconduct.  See <u>Committee for Pub. Counsel Servs</u>. v. <u>Attorney Gen</u>., 480 Mass. 700, 701-702 (2018) (egregious misconduct where State police chemist consumed drugs submitted to government laboratory for testing and drug standards used in testing and manipulated evidence to conceal actions, and assistant attorneys general were aware of those actions but undertook cover-up); <u>Bridgeman II</u>, 476 Mass. at 302 (egregiously impermissible conduct where State police chemist intentionally reported positive results without testing submitted evidence, intentionally contaminated drug samples, falsified machine reports, and committed breach of laboratory protocols).  In addition, "threats, blatant misrepresentations, or untoward blandishments by government agents" may constitute conduct that could be categorized as egregious.  See <u>Wilkins</u> v. <u>United States</u>, 754 F.3d 24, 28 (1st Cir. 2014), quoting <u>Ferrara</u>, 456 F.3d at 290.

The scathing EOPSS report highlights OAT's disturbing pattern of intentionally withholding exculpatory evidence year after year, dating back at least as early as June 2011.  The report characterizes OAT's discovery practices as "dysfunctional," guided by "serious errors of judgment," and "enabled by a longstanding and insular institutional culture that was reflexively guarded."  OAT leadership "frequently failed to seek out or take advantage of available legal

resources." As a result, thousands of documents were not produced to defendants in the Ananias litigation and in other cases, despite plainly being responsive to discovery orders and requests. These defendants thus did not have the benefit of using exculpatory authorization reports, the quality assurance manual, failed certification worksheets, and internal repair records to challenge the validity of the breath test instrument used in their individual cases. The broad scope and nature of these violations of court orders undermined the criminal justice system in the Commonwealth, compromised thousands of prosecutions for OUI offenses, and potentially resulted in inaccurate convictions. As the specially assigned District Court judge observed in his order denying the defendant's motion, the conclusion that OAT's behavior was egregiously impermissible is "inescapable."

The Commonwealth rightly does not dispute that OAT employees are government agents for purposes of a Scott-Ferrara analysis. Notably, as well, OAT assists prosecutors and forms part of the prosecution team in OUI cases, given that proof of compliance with calibration and certification protocols is an essential aspect of any OUI prosecution involving a breathalyzer machine. "[P]rior to the admission of a breathalyzer result, the Commonwealth must prove the existence of, and compliance with, the requirements of a periodic testing program [for

breathalyzer machines]."  Commonwealth v. Barbeau, 411 Mass. 782, 786 (1992).

At the time of the defendant's trial, O'Meara and the three other scientists employed at OAT were responsible for responding to discovery requests and maintaining records relative to the functioning of the breath test instruments.  Defense counsel obtained from OAT the standard breath test report form that contained certification and calibration information for the specific device used to test the defendant's BAC, which had been completed by OAT staff.  See Scott, 467 Mass. at 349-350, quoting Martin, 427 Mass. at 824 (characterizing State police chemist who "ha[d] participated in the investigation [and] evaluation of the case and ha[d] reported to the prosecutor's office concerning the case" as agent of Commonwealth).  OAT's misconduct therefore is attributable to the Commonwealth.  We also note that, prosecutors have a duty to "inquire concerning the existence of scientific tests, at least those conducted by the Commonwealth's own crime laboratory."  Martin, supra at 823-824.

"[I]n applying the Ferrara analysis to a defendant seeking to vacate a guilty plea under Mass. R. Crim. P. 30 (b), on the ground that government misconduct rendered the plea involuntary, the defendant is required to show a nexus between the government misconduct and the defendant's own case."  Scott, 467 Mass.

at 351. In this case, the motion judge held that, given the absence of a specific discovery request by the defendant prior to trial, the defendant was unable to establish the necessary nexus required by Scott. Accordingly, the judge determined that it was not within his authority to adopt a conclusive presumption of egregious misconduct for all cases involving Alcotest 9510 breathalyzer results (outside the Ananias litigation defendants). Pointing to the approximately 27,000 defendants who have been affected by OAT's misconduct, which "has cast a shadow over the entire criminal justice system," the defendant urges us to adopt a global remedy in this case, because we "cannot expect defendants to bear the burden" of the Commonwealth's systemic failures. See Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465, 476, 487 (2015) (Bridgeman I), quoting Scott, supra at 354 n.11.

Pursuant to G. L. c. 211, § 3, we have the extraordinary power to superintend "the administration of all courts of inferior jurisdiction." "Allegations of systemic abuses affecting the proper administration of justice are particularly appropriate for review pursuant to G. L. c. 211, § 3." Brantley v. Hampden Div. of the Probate & Family Court Dep't, 457 Mass. 172, 183 (2010).

In Scott, 467 Mass. at 351-352, we concluded that it would have been impossible for the defendant to show the requisite

nexus between the government misconduct and the defendant's conviction, because the State police chemist who had falsified drug test results was unable to identify the cases in which she had fabricated results or committed a breach of protocols and those in which she had followed proper procedures. We therefore fashioned a global remedy for those defendants who had been affected by the chemist's misconduct; we determined that defendants who had been convicted of a drug offense and who proffered a drug certificate signed by the chemist were entitled to a conclusive presumption that egregious government misconduct had occurred. Id. at 352. This special evidentiary rule of a conclusive presumption was "sui generis," "a remedy dictated by the particular circumstances surrounding" the chemist's misconduct, that was "intended to apply only to [the] narrow class of cases in which a defendant seeks to withdraw his or her guilty plea after having learned of" this specific misconduct. Id. at 353-354.

Although we recognize that OAT has complied with numerous remedial measures that were ordered after the discovery of the extent of the misconduct involving the Alcotest 9510 device, and some that were adopted voluntarily, these combined measures do not go far enough to restore defendants' rights. The inability of the Ananias litigation defendants to receive a fair and accurate Daubert-Lanigan hearing, and the years-long practice of

intentional withholding of exculpatory evidence, "is a lapse of systemic magnitude in the criminal justice system" that can be cured only by a global remedy. See Scott, 467 Mass. at 352. OAT's cavalier and supercilious attitude toward its discovery obligations led to the repeated concealment of evidence that its testing process was flawed. This was compounded by its failure to work with available legal counsel and the experts in the CMU who handled all other discovery requests to the crime lab and who could have assisted in the identification and production of this type of exculpatory evidence. Indeed, the reach of OAT's missteps is vast.

The Commonwealth notified approximately 27,000 defendants whose OUI convictions were implicated by OAT's misconduct. Requiring tens of thousands of defendants to bear the cost of proving that OAT's conduct was egregiously impermissible would be antithetical to our responsibility to ensure the efficient administration of justice. See Commonwealth v. Camacho, 483 Mass. 645, 650 (2019), quoting Bridgeman I, 471 Mass. at 476 (absent global remedy, "defendants wrongly would bear the burden of a systemic lapse that . . . is entirely attributable to the government"). We must "account for the due process rights of defendants, the integrity of the criminal justice system, the efficient administration of justice in responding to such potentially broad-ranging misconduct, and the myriad public

interests at stake." See Committee for Pub. Counsel Servs., 480 Mass. at 723, quoting Bridgeman I, supra at 487. Accordingly, in cases in which a defendant seeks to vacate a guilty plea as a result of the revelation of OAT's misconduct, and the defendant's breath test took place between June 1, 2011, and April 18, 2019, the defendant is entitled to a conclusive presumption that egregious government misconduct occurred.

At the same time, we do not go as far as some of the amici suggest and order the dismissal with prejudice of all OUI cases within the relevant time period. See Committee for Pub. Counsel Servs., 480 Mass. at 729 (vacating convictions and dismissing cases tainted by drug lab scandal that met certain criteria). To begin, OUI prosecutions inherently are different from prosecutions for drug offenses. Convictions of possession or distribution of drugs rise and fall on proving that the substance involved was, in fact, the illegal substance charged. "In a case charging a narcotics offense, the Commonwealth must prove beyond a reasonable doubt 'that a substance is a particular drug' because such proof is an element of the crime charged." Commonwealth v. Vasquez, 456 Mass. 350, 361 (2010), quoting Commonwealth v. McGilvery, 74 Mass. App. Ct. 508, 511 (2009), and cases cited. Without the certification that the substance at issue was the alleged illegal substance, at least as to possession, there is no case for the prosecution to

pursue.  See G. L. c. 94C, § 32A (a) ("Any person who knowingly or intentionally manufactures, distributes, dispenses or possesses with intent to manufacture, distribute or dispense a controlled substance . . . shall be punished . . .").  That, in rare instances, proof that a suspected illegal substance sold by a defendant was an illegal drug can be established in other ways, such as the testimony and observation of an experienced user of the drug, see Commonwealth v. MacDonald, 459 Mass. 148, 153-154 (2011), does not change this calculus.

Comparatively, the Commonwealth has a number of different avenues by which to pursue an OUI prosecution beyond establishing the level of alcohol in a defendant's blood. "Whoever . . . operates a motor vehicle with a percentage, by weight, of alcohol in their blood of eight one-hundredths or greater, or while under the influence of intoxicating liquor . . . shall be punished . . . ."  G. L. c. 90, § 24 (1) (a) (1).  Accordingly, OUI can be shown, for example, by field sobriety tests, police observations, blood tests, and statements by a defendant.  See, e.g., Commonwealth v. Wood, 261 Mass. 458, 459 (1927) (circumstantial evidence sufficient for OUI conviction); Commonwealth v. Belliveau, 76 Mass. App. Ct. 830, 835 (2010), quoting Commonwealth v. Petersen, 67 Mass. App. Ct. 49, 52 (2006) ("Proof of operating under the influence on a public way may 'rest entirely on circumstantial evidence'").

Thus, even where an unreliable breath test result is suppressed, the Commonwealth may have other ways in which to pursue a conviction.

We are satisfied that a conclusive presumption that all three elements needed to establish the first prong of the Scott-Ferrara test have been met "will relieve the trial courts of the administrative burden" of making findings in potentially tens of thousands of motions for a new trial, see Scott, 467 Mass. at 353, that egregious government misconduct indeed occurred. It also will assist in "restor[ing] the public's faith in the integrity of the courts," without forcing defendants to bear the cost of the government's misconduct. See Bridgeman II, 476 Mass. at 337 (Hines, J., dissenting).

Because we conclude that the defendant is entitled to a presumption that the first prong of the Scott-Ferrara test -- the existence of egregious government misconduct that antedated her plea -- has been established, see Scott, 467 Mass. at 346, we turn to consideration of the second prong of that test.

B. Reasonable probability defendant would not have pleaded guilty. The second prong of the Scott-Ferrara test requires a defendant to demonstrate a reasonable probability that he or she would not have pleaded guilty had he or she known of OAT's misconduct. See Scott, 467 Mass. at 354-355, citing United States v. Fisher, 711 F.3d 460, 469 (4th Cir. 2013), and

Ferrara, 456 F.3d at 290, 294. Establishing such a reasonable probability requires examining the totality of the circumstances, guided by a number of specific factors. These factors include

> "(1) whether evidence of the government misconduct could have detracted from the factual basis used to support the guilty plea, (2) whether the evidence could have been used to impeach a witness whose credibility may have been outcome-determinative, (3) whether the evidence is cumulative of other evidence already in the defendant's possession, (4) whether the evidence would have influenced counsel's recommendation as to whether to accept a particular plea offer, and (5) whether the value of the evidence was outweighed by the benefits of entering into the plea agreement."

Scott, supra at 355, citing Ferrara, supra at 294. The motion judge decided that the defendant had made the requisite showing, because she had established a reasonable probability that she would not have tendered her admission to sufficient facts if she had known that the breathalyzer results would be excluded.

The defendant's breath test resulted in a reported BAC of 0.23 percent. Aside from the breath test result, the judge found that proof of the defendant's impairment was based on a fairly brief interaction between the defendant and the troopers and her statement that she had had three drinks. Otherwise put, the breathalyzer result was the "crown jewel" -- the most inculpatory piece of evidence against the defendant. In conjunction with the defendant's motion to withdraw, her attorney submitted an affidavit averring that, given the

breathalyzer result, he "did not believe it would be cost effective or reasonable to take this case to trial." Had he known, however, that the breathalyzer test was not admissible, he would have advised the defendant to proceed to trial, as, in his experience, juries tend to acquit in similar cases where there is no breathalyzer result and no accident. The defendant also submitted an affidavit stating that she had relied on her attorney's advice in making the admission, and she would have followed his advice to proceed to trial.

The motion judge found, and we agree, that the disposition that the defendant received was not so favorable that the benefits of the plea outweighed the value of the evidence. The Commonwealth did not offer her a charge concession as part of the plea, and the judge ordered a two-year loss of the defendant's driver's license, as well as conditions of probation mandating attendance at AA meetings once per week, enrollment in a fourteen-day second offender program, submission to an evaluation pursuant to G. L. c. 90, § 24Q, and random alcohol testing. While the continuance without a finding was of some benefit to the defendant (who averred that it was not essential for her to continue in her line of work), we discern no error in the judge's determination that the defendant satisfied the second prong of the Scott-Ferrara test.

Accordingly, the denial of the defendant's motion to withdraw her admission to sufficient facts must be reversed.[15]

iii. Exposure to harsher sentence. The defendant argues that, should she prevail in her motion for a new trial and thereafter be convicted of the same offense, she should not be subject to a harsher sentence than that which originally was imposed. If we were to hold otherwise, she argues, it would chill OAT defendants' exercise of their postconviction rights.

"[T]his court will not review [a] matter until the entire case is ripe for review due to the burdensome nature of 'piecemeal appellate review.'" Bridgeman I, 471 Mass. at 474, quoting Campana v. Directors of the Mass. Hous. Fin. Agency, 399 Mass. 492, 499 n.16 (1987). Yet, as stated, approximately 27,000 defendants have been affected by OAT's misconduct. Thus, it is within our broad powers of superintendence under G. L. c. 211, § 3, to review the defendant's claim.

Although this issue is not ripe, we nonetheless may review it "given the significance of this case in light of the thousands of defendants who have been affected by [the Ananias litigation]." See Bridgeman I, 471 Mass. at 474. It is the Commonwealth's position that, notwithstanding the egregious

---

[15] Because of the result we reach, we need not address the defendant's arguments with respect to judicial estoppel and waiver.

government misconduct, we should not depart from our general rule that "when a defendant withdraws his [or her guilty] plea after sentencing, he [or she] may receive a harsher sentence than was originally imposed."  See Commonwealth v. DeMarco, 387 Mass. 481, 486 (1982).

In Bridgeman I, 471 Mass. at 477, we concluded that defendants who sought a new trial because of a particular police chemist's misconduct could not be charged with a greater offense than the one of which the defendant originally had been convicted.  In addition, if convicted at a new trial, the defendant could not receive a harsher sentence than the one originally imposed.  We decided that anything less would be "giving the Commonwealth a second bite at the proverbial apple in its efforts to convict the [defendants]."  Id.

So too here.  Our "goal is to fashion a remedy that will, as much as possible, place [the defendant] in the position that [she] would have been in if the government had not violated [her] constitutional right to [d]ue [p]rocess."  See Ferrara v. United States, 372 F. Supp. 2d 108, 111 (D. Mass. 2005).  Before OAT's misconduct came to light, the Commonwealth and the defendant entered into a plea agreement that they both viewed as mutually advantageous and fair.  Absent the breath test results, the motion judge found that the defendant would not have entered into the plea.  Allowing the imposition of a harsher sentence

after a new trial would vitiate her due process rights to pursue a remedy for OAT's extensive and egregious misconduct.  Thus, if the defendant is tried and convicted, her sentence must be capped at what it was under her original plea arrangement.

In this case, however, capping any subsequent sentence at the defendant's initial sentence poses a unique challenge.  As a result of her admission, the defendant's case was continued without a finding for two years, she was required to complete the fourteen-day second offender program, to submit to an evaluation as set forth in G. L. c. 90, § 24Q, to attend AA meetings at least once a week, and to submit to random alcohol testing.  Her driver's license also was suspended for two years.  In his decision denying the defendant's motion to withdraw her admission to sufficient facts, the judge characterized the plea judge's decision to continue the defendant's case without a finding as "relatively unusual" for an OUI, second offense.  The Commonwealth contends that the continuance without a finding for a second offense, less than ten years after the defendant's first conviction of OUI, constituted an illegal disposition.

An illegal sentence is one that is "in some way contrary to the applicable statute."  See Commonwealth v. Selavka, 469 Mass. 502, 505 (2014), quoting Goetzendanner v. Superintendent, Mass. Correctional Inst., Norfolk, 71 Mass. App. Ct. 533, 537 (2008).

General Laws c. 90, § 24 (1) (a) (1), which governs sentencing

for a conviction of OUI, second offense, provides:

> "If the defendant has been previously convicted . . . by a court of the Commonwealth or any other jurisdiction because of a like violation preceding the date of the commission of the offense for which [the defendant] has been convicted, . . . the defendant shall be punished . . . by imprisonment for not less than sixty days . . . [and] the sentence imposed . . . shall not be reduced to less than thirty days" (emphasis added).

The thirty-day minimum sentence may be served in an approved

facility dedicated to alcohol treatment rehabilitation "to the

extent such resources are available." G. L. c. 90,

§ 24 (1) (a) (1). The provision also contains an exception

providing that "a prosecution [for OUI] shall not be . . .

continued without a finding except for dispositions under [G. L.

c. 90, § 24D]" (emphasis added).[16] Id. General Laws c. 90,

§ 24D, permits certain defendants to "be placed on probation for

not more than two years." Those defendants, however, are

individuals who have never been convicted of a prior OUI offense

in any jurisdiction, or who have been convicted of a single like

offense ten or more years previously. See G. L. c. 90, § 24D.

The defendant does not fall into either of these two groups.

---

[16] The sentencing guidelines also note that a conviction of OUI, second offense, in violation of G. L. c. 90, § 24 (1) (a) (1), carries a mandatory minimum sentence of thirty days of confinement. See Massachusetts Sentencing Commission, Advisory Sentencing Guidelines 59, 63 (Nov. 2017).

Here, prior to her conviction of OUI for events at the sobriety checkpoint in Beverly in 2013, the defendant was convicted of a like violation of OUI in New York on May 5, 2006, clearly less than ten years previously. Thus, continuing the defendant's case without a finding, without imposing the mandatory minimum period of confinement of thirty days, was contrary to the sentencing provisions in G. L. c. 90, §§ 24 (1) (a) (1), 24D. A "'sentencing judge currently may not impose a sentence that departs from the prescribed mandatory minimum' sentence or minimum term." Commonwealth v. Rossetti, 489 Mass. 589, 594 n.7 (2022), quoting Commonwealth v. Laltaprasad, 475 Mass. 692, 693 (2016). Thus, because her original sentence was illegal, if the defendant is tried and convicted at any new trial, her new sentence would not be limited to the initial disposition.

The Commonwealth concedes that a defendant who successfully moves for a new trial, and thereafter is convicted, should be credited for so much of his or her period of license suspension as already has been served. Imposing an additional period of license suspension for the same criminal conviction implicates double jeopardy concerns. See Commonwealth v. Rollins, 470 Mass. 66, 70 (2014), citing Marshall v. Commonwealth, 463 Mass. 529, 534 (2012). For similar reasons, a defendant who has served a period of incarceration, is convicted again following a

new trial, and is sentenced to a longer period of incarceration must receive credit for the time already served following the original trial, and therefore may be required only to serve the period of the new sentence that exceeds the original. Not crediting the prior time served clearly would implicate double jeopardy concerns. In addition, a defendant's compliance with any previously mandated treatment programs or conditions, such as the fourteen-day second offender program, see G. L. c. 90, § 24 (1) (a) (1), evaluation pursuant to G. L. c. 90, § 24Q, or regular attendance at AA meetings, should be taken into account when fashioning a new sentence.

We recognize that, in this case, the defendant may have been unaware of the illegality of her sentence, which apparently was not recognized by her attorney, the prosecutor, or the motion judge, who commented only that the sentence was "relatively unusual." Moreover, the defendant successfully completed her sentence approximately eight years ago. We recognize as well that G. L. c. 90, § 24, has been amended numerous times with respect to penalties and mandatory minimums, and indeed, three amendments became effective since the defendant's conviction. See St. 2013, c. 38, § 80, eff. Mar. 1, 2014; St. 2018, c. 69, §§ 32-33, eff. April 13, 2018; St. 2020, c. 227, § 35, eff. July 1, 2021. Accordingly, in light of the egregious government misconduct that gave rise to the

defendant's motion to withdraw years after she completed serving her sentence, on remand, she should be afforded the opportunity to withdraw her motion.  See, e.g., Commonwealth v. Rodriguez, 461 Mass. 256, 261 (2012) ("Where there is a plea agreement, the judge is . . . bound to allow a defendant to withdraw his plea where the judge imposes a sentence more severe than the prosecutor's recommendation"); Commonwealth v. Najjar, 96 Mass. App. Ct. 569, 573 (2019) (allowing defendant to withdraw plea where "plea judge at the colloquy [failed] to inform the defendant of the mandatory minimum sentence on the charges to which the defendant was pleading guilty").

3.  Proceedings in future cases.  In sum, defendants who pleaded guilty to an OUI offense, where a breath test had been conducted using an Alcotest 9510 breathalyzer from June 1, 2011, through April 18, 2019, are entitled to a conclusive presumption that the first prong of the Scott-Ferrara test is satisfied, and the existence of egregious government misconduct that antedated the defendant's plea has been established.  See Scott, 467 Mass. at 346.  By extension, any breath test conducted using an Alcotest 9510 device during that time period must be excluded in any pending or future prosecutions.

Where a defendant successfully moves for a new trial due to OAT's misconduct, and thereafter is convicted, so long as the defendant's original sentence was legal, the new sentence will

be capped at no more than the original sentence.  If the defendant's original sentence was illegal, the new sentence will not be limited to the initial disposition.

4. <u>Conclusion</u>.  This matter is remanded to the District Court, where the defendant shall be allowed to withdraw her motion to withdraw her admission to sufficient facts.  If the defendant chooses not to withdraw her motion, the decision denying her motion to withdraw her admission shall be reversed, and the case shall proceed consistent with this opinion.

<u>So ordered</u>.